

George & Hannah Kasboske )
Plaintiffs )
V )
Defendants )
J. P. Morgan Chase Bank, NA, also DBA Chase Home Finance L. L. C. et. al, Pierce & Associates et. al., and Federal National Mortgage Association )

United States District Court
Northern District of Illinois

16CV2927
JUDGE BLAKEY
MAG. JUDGE GILBERT

RECEIVED
MAR 08 2016
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# COMPLAINT

Now, Come the Kasboske's, George & Hannah, hereafter known as the Kasboske's, who bring forth this lawsuit based on the Illegal actions set forth by Pierce & Associates et. al., and its client, J. P. Morgan Chase Bank, NA, also DBA, Chase Home Finance L. L. C. et. al., and Federal National Mortgage Association.

Pierce & Associates et. al., legal representatives of J. P. Morgan Chase Bank, NA, also DBA, Chase Home Finance L. L. C. et. al. while acting under the authority of J. P. Morgan Chase Bank, NA, also DBA, Chase Home Finance L. L. C. et. al., filed a Summary Summons dated October 4th, 2010, which violated the terms under the agreement of the 1963 Consent Decree and the Illinois Anti Trust Laws that came thereafter. Civil No. 3106 Filed: October 23 1963 UNITED STATES OF AMERICA Plaintiff, v. ASSOCIATION OF CASUALTY AND SURETY COMPANIES; AMERICAN MUTUAL INSURANCE ALLIANCE; and NATIONAL

ASSOCIATION OF MUTUAL CASUALTY COMPANIES, Defendants. COMPLAINT The United States of America, by its attorneys, acting under the direction of the Attorney General of the United States. Mr. Kasboske, being an Appraiser of Damaged Properties and a direct recipient and direct Descendant of this Civil No. 3106 Consent Direct Descendant Anti Trust Act, had his Constitutional and Civil Rights Violated. The three aforementioned parties, Pierce & Associates et. al., J. P. Morgan Chase Bank, NA, also DBA, Chase Home Finance L. L. C. et. al., and Federal National Mortgage Association acted in Concert and Participation to illegally obtain the Kasboske's property located at 9040 South 85th Avenue in Hickory Hills, Illinois, 60457.

Pierce & Associates et. al. and J. P. Morgan Chase Bank, NA, also DBA Chase Home Finance L. L. C.. further violated the Kasboske's Constitutional and Civi Rights by claiming Privately and Corporately Owned and Held Property as the property of J. P. Morgan Chase Bank, NA, also DBA Chase Home Finance L. L. C. et. al.. Pierce & Associates' Attorneys worked in concert and participation by putting Mr. Kasboske's patents on the World Wide Web as J. P. Morgan Chase Bank, N. A. property, without any due process. In doing so, they prohibited Mr. Kasboske from performing and upholding his duties as Presidents of K-Tech R & D and Stealth Light Corporations, as anyone doing a basic business check would find that on the Chase Bank Official Bank Websight that the property was claimed by Chase Bank. This made it impossible to Sell, Lease or Negotiate any type of income for the Corporations or Mr. Kasboske. This also violates Patent and Copyright laws because of the lack of Legal Due Process.

Following are the allegations presented in the attached lawsuit filing.

Respectfully submitted,
George Kasboske; Hannah Kasboske

Mr. George Kasboske

George Kasboske Pro Se

Mrs. Hannah Kasboske

George Kasboske

Hannah Kasboske

9040 South 85th Avenue

Hickory Hills, IL 60457

(708) 430-9971

georgekasboske4710@comcast.net

## Exhibits Outline

Exhibit A——Anti-Trust, 63 CIV. 3106

Exhibit B——ORDER APPROVING FORECLOSURE REPORT OF SALE AND DISTRIBUTION AND ORDER FOR POSSESSION AND DEED

Exhibit C——ANSWER IN CIVIL ASSET FORFEITURE PROCEEDING

Exhibit D——Chase Bank NA and Law Enforcement (Ex. Judges) are members of AAMVA

Exhibit E——About IICMVA; AAMVA is an associate member of IICMVA; IICMVA Antitrust Declaration

Exhibit F——Background and Lineage of Defendants - 1963 Consent Decree

Exhibit G——Flow Chart; Defendants, Successors and Beneficiaries; and Kasboske History

Exhibit H——DEFENDANTS' ANSWER TO PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR ORDER APPROVING REPORT OF SALE AND DISTRIBUTION AND POSSESSION; Chase Bank NA illegally claims patents issued to George Kasboske in an attempt to control him. 2 Website Pages enclosed.

Exhibit I—— Motion Slips

Exhibit J——Secretary of State Records—IGOI Corporation File Report

Exhibit K—- IGOI Identification Card

Exhibit L——IGOA Correspondence from 1963

Exhibit M—- Illinois Antitrust Act 1965 SB 116

EXHIBIT OUTLINE

( A )

# Exhibit
# ( A )

U.S.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

ASSOCIATION OF CASUALTY AND SURETY COMPANIES; AMERICAN MUTUAL INSURANCE ALLIANCE; and NATIONAL ASSOCIATION OF MUTUAL CASUALTY COMPANIES,

Defendants.

Civil No. 63 3106

Filed:

U.S. DISTRICT COURT FILED OCT 23 1963 S. D. OF N.Y.

COMPLAINT

The United States of America, by its attorneys, acting under the direction of the Attorney General of the United States, brings this civil action to obtain equitable relief against the above named defendants, and complains and alleges as follows:

I

JURISDICTION AND VENUE

1. This complaint is filed and these proceedings are instituted under Section 4 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209 (15 U.S.C. § 4), as amended, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, in order to prevent and restrain continuing violations by the defendants, as hereinafter alleged, of Sections 1 and 3 of the Sherman Act.

2. The defendant Association of Casualty and Surety Companies transacts business and is found within the Southern District of New York.

II

DEFINITIONS

3. As used herein:

(a) "Member Companies" shall be deemed to mean member companies of any of the defendant associations;

Form No. 680

No. ____________

# IN THE DISTRICT COURT
## OF THE UNITED STATES

FOR THE

SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

*vs.*

ASSOCIATION OF CASUALTY AND SURETY COMPANIES; et al

Defendants

COMPLAINT

JOHN J. GALGAY
Attorney, Department of Justice
New York Field Office
42 Broadway, Room 500
New York, N.Y. - 10004
COrtlandt 7-7100

*Filed* ____________, 19____

____________, *Clerk.*

*By* ____________, *Deputy.*

7—754 U. S. GOVERNMENT PRINTING OFFICE

(b) "Automobile" shall be deemed to mean a self-propelled vehicle used for the transportation of persons or property on the highway;

(c) "Automobile property damage liability insurance" shall be deemed to mean insurance against loss arising out of the insured's legal liability for damages to the property of others resulting from the ownership, maintenance or use of an automobile;

(d) "Automobile physical damage insurance" shall be deemed to mean insurance covering damages or loss to the automobile of the insured resulting from collision, fire, theft, and other perils;

(e) "Automobile property insurance" shall be deemed to mean automobile property damage liability insurance and automobile physical damage insurance;

(f) "Direct premiums earned" shall be deemed to mean that part of the premiums applicable to the expired part of the policy;

(g) "Direct losses incurred" shall be deemed to mean the amount of loss paid and outstanding;

(h) "Insured" shall be deemed to mean the party to whom or on behalf of whom the insurer agrees to pay losses under the insurance contract;

(i) "Insurer" shall be deemed to mean the party to the insurance contract who promises to pay losses;

(j) "Adjustment" shall be deemed to mean the process of determining the amount payable by the insurer to an insured or other claimant under the insurance contract, and the rights and obligations incident thereto;

(k) "Settlement" shall be deemed to mean the discharge of an obligation of an insurer to an insured or other claimant under an insurance contract as determined by adjustment of a claim;

(l) "Adjuster" shall be deemed to mean a person or firm who represents the insurer in the adjustment and settlement of claims with insureds or other claimants;

(m) "Automobile material damage" shall be deemed to mean any damage to an automobile resulting from collision, fire, or other perils for which automobile property insurance is available;

(n) "Repair shop" shall be deemed to mean a person or firm engaged in automobile material damage repair;

(o) "Agreed price" shall be deemed to mean a commitment by a repair shop to undertake to complete and guarantee automobile material damage repairs in consideration of the amount of an appraiser's estimate.

III

DEFENDANTS

4. Association of Casualty and Surety Companies (hereinafter referred to as "ACSC"), which maintains its principal office at 110 William Street, New York, New York, is made a defendant herein. ACSC is an unincorporated trade association whose membership is composed of 133 stock insurance companies doing business in the United States.

5. American Mutual Insurance Alliance (hereinafter referred to as "AMIA"), a corporation organized and existing under the laws of the State of Illinois, with its principal office at 20 North Wacker Drive, Chicago, Illinois, is made a defendant herein. AMIA is a trade association whose membership is composed of 106 mutual insurance companies doing business in the United States.

6. National Association of Mutual Casualty Companies (hereinafter referred to as "NAMCC"), a corporation organized and existing under the laws of the State of Illinois, with its principal office at 20 North Wacker Drive, Chicago, Illinois, is made a defendant herein. NAMCC is a trade association whose membership is composed of 26 mutual insurance companies doing business in the United States. All members of the NAMCC which write automobile property insurance are members also of AMIA.

IV

CO-CONSPIRATORS

7. Various other persons, firms, organizations and corporations, including but not limited to member companies, sponsored appraisers, and repair shops, not made defendants herein have participated as co-conspirators with the defendants in the offense hereinafter charged and have performed acts and have made statements in furtherance thereof.

V

NATURE OF TRADE AND COMMERCE

8. An important branch of the insurance industry is automobile property insurance which provides coverage for property losses arising out of the ownership or use of automobiles. This coverage is provided by two types of insurance: Automobile property damage liability insurance and automobile physical damage insurance.

9. Total direct premiums earned in the United States by all insurance companies in 1960 for automobile property insurance amounted to approximately $3,327,815,566. Of the total direct premiums earned in 1960, member companies accounted for approximately 35.5 percent, or approximately $1,183,642,376. Total direct losses incurred in the United States in 1960 by all insurance companies under automobile property insurance amounted to approximately $1,787,276,826. Of the total direct losses incurred in 1960, member companies accounted for approximately 35.2 percent, or $627,948,160.

6. National Association of Mutual Casualty Companies (hereinafter referred to as "NAMCC"), a corporation organized and existing under the laws of the State of Illinois, with its principal office at 20 North Wacker Drive, Chicago, Illinois, is made a defendant herein. NAMCC is a trade association whose membership is composed of 26 mutual insurance companies doing business in the United States. All members of the NAMCC which write automobile property insurance are members also of AMIA.

IV

CO-CONSPIRATORS

7. Various other persons, firms, organizations and corporations, including but not limited to member companies, sponsored appraisers, and repair shops, not made defendants herein have participated as co-conspirators with the defendants in the offense hereinafter charged and have performed acts and have made statements in furtherance thereof.

V

NATURE OF TRADE AND COMMERCE

8. An important branch of the insurance industry is automobile property insurance which provides coverage for property losses arising out of the ownership or use of automobiles. This coverage is provided by two types of insurance: Automobile property damage liability insurance and automobile physical damage insurance.

9. Total direct premiums earned in the United States by all insurance companies in 1960 for automobile property insurance amounted to approximately $3,327,815,566. Of the total direct premiums earned in 1960, member companies accounted for approximately 35.5 percent, or approximately $1,183,642,376. Total direct losses incurred in the United States in 1960 by all insurance companies under automobile property insurance amounted to approximately $1,787,276,826. Of the total direct losses incurred in 1960, member companies accounted for approximately 35.2 percent, or $627,948,160.

10. Automobile property insurance is sold by insurance companies, including member companies, throughout the United States, and in the District of Columbia, by the issuance of an insurance contract, commonly called a policy, in exchange for an amount of money, commonly called premiums. The automobile property insurance business involves a continuous and indivisible stream of intercourse among states composed of collections of premiums, payments of policy obligations, and documents and communications essential to the negotiation and execution of policy contracts and the adjustment and settlement of claims.

11. A vital phase of the automobile property insurance business is the adjustment and settlement of claims. A great majority of the claims under automobile property insurance policies are for automobile material damage. It is the general practice for member companies to employ a claim representative, commonly referred to as a claim manager, to supervise and be responsible for the adjustment and settlement of claims, including those under automobile property insurance, arising in the territory assigned to him. An integral part of the process of adjustment and settlement of claims arising under automobile property insurance is determining the cost of repairing damaged automobiles. One way of accomplishing this is for the claim manager or adjuster to engage an appraiser to prepare an estimate of the repair cost.

12. An appraiser operates by examining the damaged automobile to determine the damage covered by automobile property insurance, the repairs that must be made, the time it will take to make them and thereafter securing an agreed price from a repair shop. The agreed price is transmitted by the appraiser to the claim manager or adjuster, and is used as a basis for adjusting and settling the claim. The process of adjustment and settlement of claims includes a continual transmission to and from and between home offices of insurance companies, claim managers, adjusters, appraisers, and claimants located in different

states of the United States and the District of Columbia of claim forms, statements, reports, directives, checks and drafts, documents and communications of various kinds, all of which are essential to the adjustment and settlement of claims.

13. A major part of direct losses incurred under automobile property insurance is attributable to automobile material damage repair costs; and a major part of the automobile material damage repair business is the repair of automobile damage covered by automobile property insurance. The automobile material damage repair business consists of the repair and replacement of automobile parts and is engaged in by repair shops located in all states of the United States and the District of Columbia. The price charged by repair shops for automobile material damage repairs consists of a labor charge, which is an hourly rate applied to the time taken to repair or replace parts, and a parts charge for any parts which are used to replace damaged parts on the automobile. Automobile parts are manufactured by automobile manufacturers and others in plants located in various states of the United States and are sold and shipped by them to jobbers, wholesalers and dealers located in the District of Columbia and states other than the states in which they were manufactured for resale to repair shops for sale and use in the repair of damaged automobiles.

Background of the Conspiracy

14. The ACSC has had for many years a committee known as the Advisory Committee of the Claims Bureau, sometimes referred to as the Claims Bureau Advisory Committee, which is composed of approximately 18 claims executives of member companies. The NAMCC has had for many years a committee known as the Claims Executive Committee which is composed of approximately 8 claims executives of member companies. It was and is the function of these committees to consider on behalf of their respective associations policies and programs relating to

claims administration. An additional function of the Advisory Committee of the Claims Bureau of the ACSC is to supervise the operations of and formulate policies for the Claims Bureau, a department of the ACSC. The Claims Bureau, which has a large administrative staff, maintains its headquarters at 110 William Street, New York, New York, and also has several regional offices located throughout the United States. The function of the Claims Bureau is to aid in claims administration.

15. Beginning in or about 1940, the Advisory Committee of the Claims Bureau of the ACSC and the Claims Executive Committee of the NAMCC began to hold joint meetings. These meetings were soon formalized into regular joint sessions and the group became known as the Joint Claims Committee and later the Combined Claims Committee (hereinafter referred to as "CCC"). These two committees were designated by their respective defendant associations to represent the interests of member companies on the CCC. The purpose and function of the CCC was and is to provide a common forum to consider policies and programs relating to claims administration. In 1962, by resolution of the governing boards of the defendants, the Claims Executive Committee of the NAMCC was designated to represent AMIA on the CCC.

16. On March 12, 1942 the CCC passed a resolution which provided for the organization of Casualty Insurance Claim Managers' Councils (hereinafter referred to as "Councils") in various areas of the United States to act as sub-committees of and under the direction and control of the CCC, then known as the Joint Claims Committee. These Councils are each chartered by the CCC. Each Council's membership is composed of those member companies which have a full time, salaried claim representative in the area under that Council's jurisdiction. The primary purpose and function of the Councils are to permit field claim managers of member companies to consider local problems of claims administration, including those arising under automobile property insurance. At the present time there are approximately 80 Councils located throughout the United States, including the District of Columbia.

17. In the Fall of 1946, the Pittsburgh, Pennsylvania Council met to consider what collective action might be taken by its members to depress and control automobile material damage repair costs in the Pittsburgh area. In March 1947, the Pittsburgh Council adopted a program, subsequently known as the Independent Appraisal Plan (hereinafter referred to as the "Plan"), intended to depress and control automobile material damage repair costs. The CCC in December 1948 and again in July 1949 formally adopted the Plan and since that time has sponsored it and actively promoted its expansion and use. Since its inception the Plan, under the supervision and direction of the CCC, and administered by the Claims Bureau of the ACSC and the Councils, has become a nationwide operation. By the end of 1961, it was in effect in 177 localities throughout the United States, including the District of Columbia. The CCC requires uniformity in the operation of the Plan throughout the United States.

18. Under the Plan, a Council in collaboration with the CCC, selects and sponsors an individual or partnership to act as appraiser to make determinations of automobile material damage costs for use in the adjustment and settlement of claims. Prior to the selection of a sponsored appraiser, Council members are instructed to submit to the Council the volume of business they anticipate giving the appraiser in the area for which he is to be sponsored. The sponsored appraiser is required to employ sufficient personnel to handle any volume of appraisal business in his territory. Most such appraisers have several employees. The sponsored appraiser is required to confine his operations to the territory for which he is sponsored by the Council or CCC. The fees which the sponsored appraiser charges are subject to the approval of the sponsoring Council or CCC. The sponsored appraiser is required to conform his operations to the principles of the Plan and to assure his compliance, his operations are supervised and controlled by the sponsoring Council and the Claims Bureau on behalf of the CCC. The Plan calls for exclusive use of the sponsored appraiser by member

companies and the sponsored appraiser is urged to solicit business from others in order to increase the effectiveness of the Plan.

19.  Included among the means used under the Plan to control and depress automobile material damage repair costs are the following: (1) to repair rather than replace damaged parts; (2) to replace damaged parts by used rather than new parts; (3) to obtain discounts on new replacement parts; (4) to establish strict labor time allowances by the sponsored appraisers; and (5) to obtain the lowest possible hourly labor rate.

20.  The Plan calls for the sponsored appraiser to arrange for a number of repair shops to agree to make automobile material damage repairs based upon his estimate without the repair shop first examining the damaged automobile.  In those situations in which the damaged automobile is not already in the possession of a repair shop, the sponsored appraiser will recommend any of these repair shops to the adjuster or claim manager.  In those instances where a particular repair shop in which the damaged automobile is located will not agree to make repairs based upon the sponsored appraiser's estimate, the Plan provides that the sponsored appraiser shall inform the adjuster or claim manager of the names of those repair shops which will accept his estimate and that the adjuster or claim manager will then, when possible, have the damaged automobile repaired by one of the repair shops which have agreed to accept the sponsored appraiser's estimate. It is seldom that a claim is settled at a higher figure than the sponsored appraiser's estimate.

21.  The nationwide application of the Plan involves a continuous intercourse among the states composed of memoranda, correspondence, directives and other communications to and from and between the CCC, defendants, Claims Bureau, member companies, Councils and sponsored appraisers.

VI

OFFENSES CHARGED

22. Beginning in or about 1947, and continuing up to and including the date of the filing of this complaint, the defendants and co-conspirators have engaged in a combination and conspiracy in unreasonable restraint of the aforesaid trade and commerce in the adjustment and settlement of automobile property insurance claims, the automobile material damage appraisal business and the automobile material damage repair business, in violation of Sections 1 and 3 of the Sherman Act. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

23. The aforesaid combination and conspiracy has consisted of a continuing agreement and concert of action among the defendants and co-conspirators to eliminate competition among member companies in the adjustment and settlement of automobile property insurance claims, among appraisers and among repair shops, in order to control and depress automobile material damage repair costs through boycott, coercion and intimidation of repair shops.

24. Pursuant to and in effectuation of the aforesaid combination and conspiracy the defendants and co-conspirators did those things which, as hereinbefore alleged, they agreed to do and, among others, did the following things:

(a) Refused to recognize or sponsor more than one appraiser in a territory designated by a Council or the CCC;

(b) Coerced sponsored appraisers to operate only in the territories in which they are sponsored;

(c) Induced member companies to channel their automobile material damage appraisal business to the sponsored appraiser and boycott other automobile material damage appraisal businesses;

(d) Encouraged the use of sponsored appraisers by others to increase the effectiveness of the Plan;

(e) Required sponsored appraisers to conform their operations to the Plan and withdrew or threatened to withdraw the sponsorship of appraisers who failed to do so;

(f) Required fees charged by sponsored appraisers to be approved by Councils or the CCC;

(g) Induced member companies to refuse to settle a claim for an amount greater than a sponsored appraiser's estimate of the automobile material damage repair costs; and

(h) Induced member companies to channel automobile material damage repair business to those repair shops which will, and boycott those repair shops which will not:

(1) Accept the sponsored appraiser's estimate as to the cost of repairs;

(2) Give a price discount on replacement parts;

(3) Maintain hourly labor rates at a figure which is considered the lowest possible rate in the area; and

(4) Accede to the sponsored appraiser's determination of time allowances.

VII

EFFECTS

25 The aforesaid offenses have had, among others, the following effects:

(a) Elimination of competition in the adjustment and settlement of automobile property insurance claims, in the automobile material damage appraisal business and in the automobile material damage repair business;

(b) Non-sponsored appraisers engaged in or desiring to engage in the automobile material damage appraisal business have

been foreclosed from a substantial segment of the business;

(c) Repair shops which refuse to accept the sponsored appraisers' estimates have been foreclosed from a substantial segment of the automobile material damage repair business; and

(d) Prices charged by repair shops have been subjected to collective control and supervision by defendants and co-conspirators.

PRAYER

WHEREFORE, the plaintiff prays:

1. That the aforesaid combination and conspiracy be adjudged and decreed to be in violation of Sections 1 and 3 of the Sherman Act.

2. That each of the defendants, their officers, directors, agents, and employees, and all committees or persons acting or claiming to act on behalf of the defendants or any of them, be perpetually enjoined from continuing to carry out, directly or indirectly, the aforesaid combination and conspiracy to restrain interstate trade and commerce in the adjustment and settlement of automobile property insurance claims, the automobile material damage appraisal business and the automobile material damage repair business; and that they be perpetually enjoined from engaging in or participating in practices, contracts, agreements, or understandings, or claiming any rights thereunder, having the purpose or effect of continuing, reviving, or renewing the aforesaid offense or any offenses similar thereto.

3. That each of the defendants be enjoined from, either individually or in concert with others: (1) sponsoring or preferentially dealing with any appraiser; (2) boycotting any appraiser; (3) exercising any control over or influence upon the activities of any appraiser; (4) channeling or attempting to channel automobile material damage repair business to any repair shop or type of repair shop; (5) boycotting any repair shop or type of repair shop; or (6) coercing any repair shop to conform its prices for repair work or parts to the estimates of any appraiser or otherwise influencing the prices for repair work or parts.

4. That each of the defendants be ordered to amend its by-laws to require each of its member companies to refrain from acting in concert with any other companies in: (1) sponsoring or preferentially dealing with any

appraiser; (2) boycotting any appraiser; (3) exercising any control over or influence upon the activities of any appraiser; (4) channeling or attempting to channel automobile material damage repair business to any repair shop or type of repair shop; (5) boycotting any repair shop or type of repair shop; (6) coercing any repair shop to conform its prices for repair work or parts to the estimates of any appraiser or otherwise influencing the prices for repair work on parts; and to make compliance with such requirements a condition of membership.

5. That pursuant to Section 5 of the Sherman Act an order be made and entered herein requiring defendants AMIA and NAMCC to be brought before the Court in this proceeding and directing the Marshal of the Northern District of Illinois to serve summons upon AMIA and NAMCC.

6. That the plaintiff have such other and further relief as the nature of the case may require and the Court may deem just and proper.

7. That the Plaintiff recover the costs of this suit.

Dated: New York, New York
October 22nd, 1963.

ROBERT F. KENNEDY
Attorney General

WILLIAM H. ORRICK, JR.
Assistant Attorney General

BADDIA J. RASHID
Attorney, Department of Justice

JOHN H. WATERS

WILLIAM H. ROWAN

Attorneys, Department of Justice

Form No. 660

No. ____________

IN THE DISTRICT COURT

OF THE UNITED STATES

FOR THE

SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ASSOCIATION OF CASUALTY AND SURETY COMPANIES; et al

Defendants

STIPULATION and PROPOSED

FINAL JUDGMENT

JOHN J. GALGAY
Attorney, Department of Justice
New York Field Office
42 Broadway, Room 500
New York, N.Y.- 10004
COrtlandt 7-7100

Filed ____________, 19____

____________, Clerk.

By ____________, Deputy.

7—284 U. S. GOVERNMENT PRINTING OFFICE

U.S.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

ASSOCIATION OF CASUALTY AND SURETY COMPANIES, AMERICAN MUTUAL INSURANCE ALLIANCE and the NATIONAL ASSOCIATION OF MUTUAL CASUALTY COMPANIES,

Defendants.

63 CIVIL ACTION No. 3106

ENTERED:

U.S. DISTRICT COURT
FILED
OCT 23 1963
S. D. OF N.Y.

STIPULATION

It is stipulated by and between the undersigned parties, by their respective attorneys, that:

(1) The parties consent that a Final Judgment in the form hereto attached may be filed and entered by the Court at any time after the expiration of thirty (30) days following the date of filing of this Stipulation without further notice to any party or other proceedings, either upon the motion of any party or upon the Court's own motion, provided that plaintiff has not withdrawn its consent as provided herein;

(2) The plaintiff may withdraw its consent hereto at any time within said period of thirty (30) days by serving notice thereof upon the other parties hereto and filing said notice with the Court;

(3) In the event plaintiff withdraws its consent hereto, this Stipulation shall be of no effect whatever in

this or any other proceeding and the making of this Stipulation shall not in any manner prejudice any consenting party in any subsequent proceedings.

Dated: October 22nd, 1963

For the Plaintiff:

William H. Orrick, Jr.,
Assistant Attorney General

Attorneys, Department of Justice

For the Defendant Association of Casualty and Surety Companies:

For the Defendants American Mutual Insurance Alliance and the National Association of Mutual Casualty Companies:

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. ASSOCIATION OF CASUALTY AND SURETY COMPANIES, AMERICAN MUTUAL INSURANCE ALLIANCE and the NATIONAL ASSOCIATION OF MUTUAL CASUALTY COMPANIES, Defendants. | CIVIL ACTION No. ENTERED: |

FINAL JUDGMENT

Plaintiff, United States of America, having filed its complaint herein on October 22nd, 1963, and the plaintiff and the defendants, by their respective attorneys, having consented to the entry of this Final Judgment without admission by any party with respect to any issue herein:

NOW, THEREFORE, before the taking of any testimony herein, without trial or adjudication of any issue, and upon such consent, as aforesaid, it is hereby

ORDERED, ADJUDGED AND DECREED as follows:

I

This Court has jurisdiction of the subject matter hereof and the parties hereto and the complaint states a claim upon which relief can be granted under Sections 1 and 3 of the Act of Congress of July 2, 1890, commonly known as the Sherman Act, as amended.

II

The provisions of this Final Judgment shall be binding upon each defendant and upon its officers, directors,

agents, servants, employees, committees, successors and assigns, and upon all other persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise.

III

(A) Each defendant is ordered and directed within 90 days from the entry of this Final Judgment to terminate, cancel and abandon the Independent Appraisal Plan, sometimes known as the Automotive Damage Appraisal Plan, which the defendants have established and are now administering, and each defendant is enjoined from reviving, renewing or again placing into effect that plan.

(B) Defendants are ordered and directed within 90 days from the entry of this Final Judgment to send a written notice, in the form attached hereto as an exhibit, stating that all defendants have terminated, cancelled and abandoned the Independent Appraisal Plan (1) to each appraiser sponsored under the Plan, (2) to each member company, and (3) to each Local Casualty Insurance Claims Managers' Council.

IV

(A) Each defendant is enjoined from placing into effect any plan, program or practice which has the purpose or effect of

(1) sponsoring, endorsing or otherwise recommending any appraiser of damage to automotive vehicles;

(2) directing, advising or otherwise suggesting that any person or firm do business or refuse to do

business with (a) any appraiser of damage to automotive vehicles with respect to the appraisal of such damage, or (b) any independent or dealer franchised automotive repair shop with respect to the repair of damage to automotive vehicles;

(3) exercising any control over the activities of any appraiser of damage to automotive vehicles;

(4) allocating or dividing customers, territories, markets or business among any appraisers of damage to automotive vehicles; or

(5) fixing, establishing, maintaining or otherwise controlling the prices to be paid for the appraisal of damage to automotive vehicles, or to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

(B) Nothing in Subsection (A) above shall be deemed to prohibit the furnishing to any person or firm of any information indicating corrupt, fraudulent or unlawful practices on the part of any appraiser of damage to automotive vehicles or any independent or dealer franchised automotive repair shop, so long as the furnishing of such information is not part of a plan, program or practice enjoined in paragraphs (1) through (5) of Subsection (A) above. Each defendant shall include in any report of such information an affirmative statement that such report is not a recommendation and that the person or firm to whom such report is furnished should independently determine whether to do business with any

appraiser or automotive repair shop to which the report relates.

V

Defendants are ordered and directed within 90 days from the entry of this Final Judgment to cause the charter of each Local Casualty Insurance Claims Managers' Council to be amended so as to incorporate therein a declaration of policy that the Council shall not engage in any activity prohibited by Section IV of this Final Judgment.

VI

Nothing in Section IV of this Final Judgment shall be deemed to determine or constitute a waiver of any rights or immunities that defendants may have under the Act of Congress of March 9, 1945, commonly known as the McCarran-Ferguson Act.

VII

(A) For the purpose of determining and securing compliance with this Final Judgment and subject to any legally recognized privilege, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant made to its principal office, be permitted

(1) access during the office hours of such defendant to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of such

defendant relating to any of the matters contained in this Final Judgment during which time counsel for such defendant may be present; and

(2) subject to the reasonable convenience of such defendant and without restraint or interference from it to interview officers or employees of such defendant, who may have counsel present, regarding any such matters.

(B) Any defendant, on the written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, shall submit within a reasonable time such reports in writing, under oath if requested, with respect to any matters contained in this Final Judgment as may be reasonably necessary for the purpose of the enforcement of this Final Judgment.

(C) No information obtained by the means provided in this Section VII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch, except in the course of legal proceedings to which the United States of America is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

VIII

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment or for the modification or termination of any of the provisions thereof, and for

the enforcement of compliance therewith and punishment of violations thereof.

Dated:           , 1963

                         United States District Judge

EXHIBIT

Special Bulletin

The United States Department of Justice on _______________________, 1963, filed a complaint in the United States District Court for the Southern District of New York, alleging that the Association of Casualty and Surety Companies, the American Mutual Insurance Alliance and the National Association of Mutual Casualty Companies had violated the antitrust laws.

On , 1963, a Consent Judgment was entered, having been previously agreed upon by the Department of Justice and by the attorneys for the three named defendants.

The Judgment commands, among other things, that the three defendants, their officers, directors, agents, servants, employees, committees, successors and assigns must, within ninety days of the entry of the Judgment, terminate, cancel and abandon the Independent Appraisal Plan, which has also been known as the Automotive Damage Appraisal Plan. Accordingly, this is to notify you that that plan is hereby terminated, that neither the three defendants nor anyone acting on their behalf, including the Local Casualty Insurance Claims Managers' Councils, will hereafter sponsor in any way any appraiser of damage to automotive vehicles, and that any existing sponsorship of any such appraiser is hereby withdrawn.



UNITED STATES DEPARTMENT OF JUSTICE

WASHINGTON, D.C.

Address Reply to the
Division Indicated
and Refer to Initials and Number

WHO:WDK:
60-169-41

November ~~22~~ 27th, 1963

Mr. James E. Valeche
Clerk of the Court
United States District Court
for the Southern District of New York
New York, N. Y.

Re: United States v. Association of Casualty and <u>Surety Companies, et al. (Civ. No. 63 Civ. 3106)</u>

Dear Mr. Valeche:

This is to advise you that plaintiff has not withdrawn its consent to the entry of the Final Judgment attached to the stipulation filed in the captioned case on October 23, 1963.

Sincerely yours,

WILLIAM H. ORRICK, JR.
Assistant Attorney General
Antitrust Division

W. D. Kilgore, Jr.

By: William D. Kilgore, Jr.
Chief, Judgments & Judgment
Enforcement Section

Form No. 680

Civil
No. 63 Civil 3106

# IN THE DISTRICT COURT
## OF THE UNITED STATES

FOR THE

SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ASSOCIATION OF CASUALTY AND SURETY COMPANIES; et al

Defendants

F I N A L   J U D G M E N T

John J. Galgay
~~Attorney, Department of Justice~~
Chief, New York Office, Antitrust Division
42 Broadway, Room 500
New York, N.Y. 10004
COrtlandt 7-7100

Filed ______________, 19____

______________, Clerk.

By ______________, Deputy.

7—754 U. S. GOVERNMENT PRINTING OFFICE

UNITED STATES OF AMERICA,

Plaintiff,

v.

ASSOCIATION OF CASUALTY AND SURETY COMPANIES, AMERICAN MUTUAL INSURANCE ALLIANCE and the NATIONAL ASSOCIATION OF MUTUAL CASUALTY COMPANIES,

Defendants.

CIVIL ACTION NO. 63 Civ. 3106

ENTERED:

U.S. DISTRICT COURT FILED NOV 27 1963 S.D. OF N.Y.

FINAL JUDGMENT

Plaintiff, United States of America, having filed its complaint herein on October 23, 1963, and the plaintiff and the defendants, by their respective attorneys, having consented to the entry of this Final Judgment without admission by any party with respect to any issue herein;

NOW, THEREFORE, before the taking of any testimony herein, without trial or adjudication of any issue, and upon such consent, as aforesaid, it is hereby

ORDERED, ADJUDGED AND DECREED as follows:

I

This Court has jurisdiction of the subject matter hereof and the parties hereto and the complaint states a claim upon which relief can be granted under Sections 1 and 3 of the Act of Congress of July 2, 1890, commonly known as the Sherman Act, as amended.

II

The provisions of this Final Judgment shall be binding upon each defendant and upon its officers, directors, agents, servants, employees, committees, successors and assigns, and upon all other persons in active

concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise.

III

(A) Each defendant is ordered and directed within ninety (90) days from the entry of this Final Judgment to terminate, cancel and abandon the Independent Appraisal Plan, sometimes known as the Automotive Damage Appraisal Plan, which the defendants have established and are now administering, and each defendant is enjoined from reviving, renewing or again placing into effect that plan.

(B) Defendants are ordered and directed within ninety (90) days from the entry of this Final Judgment to send a written notice, in the form attached hereto as an exhibit, stating that all defendants have terminated, cancelled and abandoned the Independent Appraisal Plan (1) to each appraiser sponsored under the Plan, (2) to each member company, and (3) to each Local Casualty Insurance Claims Managers' Council.

IV

(A) Each defendant is enjoined from placing into effect any plan, program or practice which has the purpose or effect of

(1) sponsoring, endorsing or otherwise recommending any appraiser of damage to automotive vehicles;

(2) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with (a) any appraiser of damage to automotive vehicles with respect to the appraisal of such damage, or (b) any independent or dealer franchised automotive repair shop with respect to the repair of damage to automotive vehicles;

(3) exercising any control over the activities of any appraiser of damage to automotive vehicles;

(4) allocating or dividing customers, territories, markets or business among any appraisers of damage to automotive vehicles; or

(5) fixing, establishing, maintaining or otherwise controlling the prices to be paid for the appraisal of damage to automotive vehicles, or to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

(B) Nothing in Subsection (A) above shall be deemed to prohibit the furnishing to any person or firm of any information indicating corrupt, fraudulent or unlawful practices on the part of any appraiser of damage to automotive vehicles or any independent or dealer franchised automotive repair shop, so long as the furnishing of such information is not part of a plan, program or practice enjoined in paragraphs (1) through (5) of Subsection (A) above. Each defendant shall include in any report of such information an affirmative statement that such report is not a recommendation and that the person or firm to whom such report is furnished should independently determine whether to do business with any appraiser or automotive repair shop to which the report relates.

V

Defendants are ordered and directed within ninety (90) days from the entry of this Final Judgment to cause the charter of each Local Casualty Insurance Claims Managers' Council to be amended so as to incorporate therein a declaration of policy that the Council shall not engage in any activity prohibited by Section IV of this Final Judgment.

VI

Nothing in Section IV of this Final Judgment shall be deemed to determine or constitute a waiver of any rights or immunities that defendants may have under the Act of Congress of March 9, 1945, commonly known as the McCarran-Ferguson Act.

VII

(A) For the purpose of determining and securing compliance with this Final Judgment and subject to any legally recognized privilege, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant made to its principal office, be permitted

(1) access during the office hours of such defendant to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of such defendant relating to any of the matters contained in this Final Judgment during which time counsel for such defendant may be present; and

(2) subject to the reasonable convenience of such defendant and without restraint or interference from it to interview officers or employees of such defendant, who may have counsel present, regarding any such matters.

(B) Any defendant, on the written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, shall submit within a reasonable time such reports in writing, under oath if requested, with respect to any matters contained in this Final Judgment as may be reasonably necessary for the purpose of the enforcement of this Final Judgment.

(C) No information obtained by the means provided in this Section VII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch, except in the course of legal proceedings to which the United States of America is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

VIII

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment or for the modification or termination of any of the provisions thereof, and for the enforcement of compliance therewith and punishment of violations thereof.

Dated: Nov. ~~25th~~ 27th, 1963

Edward C. McLean
United States District Judge

JUDGMENT ENTERED 11/27/63

James E. Valecke
Clerk

EXHIBIT

Special Bulletin

The United States Department of Justice on ________________, 1963, filed a complaint in the United States District Court for the Southern District of New York alleging that the Association of Casualty and Surety Companies, the American Mutual Insurance Alliance and the National Association of Mutual Casualty Companies had violated the antitrust laws.

On                    , 1963, a Consent Judgment was entered, having been previously agreed upon by the Department of Justice and by the attorneys for the three named defendants.

The Judgment commands, among other things, that the three defendants, their officers, directors, agents, servants, employees, committees, successors and assigns must, within ninety days of the entry of the Judgment, terminate, cancel and abandon the Independent Appraisal Plan, which has also been known as the Automotive Damage Appraisal Plan. Accordingly, this is to notify you that that plan is hereby terminated, that neither the three defendants nor anyone acting on their behalf, including the Local Casualty Insurance Claims Managers' Councils, will hereafter sponsor in any way any appraiser of damage to automotive vehicles, and that any existing sponsorship of any such appraiser is hereby withdrawn.

63 C. v. 3106

**CIVIL DOCKET**

**UNITED STATES DISTRICT COURT**

**Jury demand date:**

D. C. Form No. 106 Rev.

| TITLE OF CASE | ATTORNEYS |
|---|---|
| UNITED STATES OF AMERICA | For plaintiff: |
| VS | John J Galgay, Attorney, Dept. of Justice |
| ASSOCIATION OF CASUALTY AND SURETY COMPANIES | 42 Broadway, NYC |
| AMERICAN MUTUAL INSURANCE ALLIANCE | |
| NATIONAL ASSOCIATION OF MUTUAL CASUALTY COMPANIES | |
| | For defendant: |

| STATISTICAL RECORD | COSTS | | DATE | NAME OR RECEIPT NO. | REC. | DISB. |
|---|---|---|---|---|---|---|
| J.S. 5 mailed x | Clerk | | | | | |
| J.S. 6 mailed ✓ | Marshal | | | | | |
| Basis of Action: Sherman Act | Docket fee | | | | | |
| | Witness fees | | | | | |
| Action arose at: | Depositions | | | | | |

63 Civ. 3106    United States of America    vs    Association of Casualty & Surety Co et al 63 Civ 3106

| DATE | PROCEEDINGS | Date Order or Judgment Noted |
|---|---|---|
| Oct.23-63 | Filed complaint and issued summons | |
| Oct. 23-63 | Filed consent to enter final judgment after 30days, as indicated | |
| Nov. 27-63 | Filed final judgment on consent enjoining the sponsoring of appraisers of insured automotive damage and attempting to control the proces charged by automotive repair shops--McLean,J.--judgment entered--Clerk | ent.11-27-63 |

(B)

# Exhibit
# ( B )

STATE OF ILLINOIS
COUNTY OF COOK

ATTY NO. 91220

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT - CHANCERY DIVISION**

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION )
Plaintiff,)
vs. )
GEORGE KASBOSKE; HANNAH KASBOSKE; JPMORGAN )
CHASE BANK, NA; Defendants,)

10 CH 43017
Calendar 60

**9040 SOUTH 85TH AVENUE, HICKORY HILLS, IL 60457**

**ORDER APPROVING FORECLOSURE REPORT OF SALE AND DISTRIBUTION AND ORDER FOR POSSESSION AND DEED**

NOW COMES the Plaintiff herein, by and through its Attorneys, PIERCE & Assoc., on its Motion for Confirmation of Sale and Right to Possession and the Court, finding due notice of said Motion having been given, having examined the Report of Sale, and it appearing that no objections having been filed, and being fully advised in the premises, FINDS:

1. That the Sale and distribution of Sale proceeds was conducted in accordance with the Judgment for Foreclosure and Sale entered herein and applicable law.

2. The Notice of Sale, required in accordance with 735 ILCS 5/15-1507(c), has been given; the terms of the Sale were fair and conscionable; the Sale was conducted fairly and without fraud.

3. The real property that is the subject matter of this proceeding is a occupied single family residence

4. The real property was last inspected by movant or movant's agent on: October, 9, 2015

IT IS THEREFORE ORDERED:

A. Said Report of Sale is approved and confirmed and the Foreclosure Sale Officer's Commission is approved for distribution.

B. There shall be an IN PERSONAM deficiency judgment entered in the sum of ($164,837.56), against GEORGE KASBOSKE and HANNAH KASBOSKE with interest thereon as by statute provided, against the subject property;

C. That, by reason of the above sale deficiency bid, the Special Right of Redemption pursuant to Section 1604 of the Illinois Mortgage Foreclosure Law (S.H.A. 735 ILCS 5/15-1604) is applicable hereunder;

D. A Deed shall be issued by the Office conducting this Sale immediately following entry of this Order and after full payment of the bid amount, to the successful bidder JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, or Assignee, conveying title pursuant to 735 ILCS 5/15-1509 on the property legally described as follows; LOT 28 IN PRILL'S HICKORY HILLS ADDITION, OF THE SOUTH 1/2 OF THE SOUTH 1/2 OF THE EAST 1/2 OF THE SOUTH 1/2 OF THE EAST 1/2 OF THE EAST 1/2 OF THE NORTHWEST 1/4 OF SECTION 2, TOWNSHIP 37 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF REGISTERED IN THE OFFICE OF THE REGISTRAR OF TITLES OF COOK COUNTY, ILLINOIS, ON MAY 16, 1958 AS DOCUMENT 1796188.

E. The successful bidder JPMORGAN CHASE BANK, NATIONAL

ASSOCIATION, or Assignee, is entitled to and shall have possession of the premises as of a date 30 days after the entry of the Order, without further Order of Court, as provided in 735 ILCS 5/15-1701;

F. That 735 ILCS 5/9-117 of the Illinois Code of Civil Procedure is not applicable to this Order.

G. A copy of this order shall be mailed to the borrower(s) at his/her last known address within seven (7) days;

H. That the Sheriff of Cook County is directed to place the Plaintiff in possession of the premises commonly known as:

9040 SOUTH 85TH AVENUE, HICKORY HILLS, IL 60457

I. That the Sheriff is further ordered to evict, no sooner than 30 days from the entry of this Order:

GEORGE KASBOSKE, HANNAH KASBOSKE now in possession of the premises commonly known as:

9040 SOUTH 85TH AVENUE, HICKORY HILLS, IL 60457

No occupants other than the individuals named in the Order of Possession may be evicted without a Supplemental Order of Possession or an order from the Forcible Entry and Detainer Court;

J. That the Municipality or County may contact the below with concerns about the real property:

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION c/o Paulette Sierra 24 Asset Management 13155 SW 42nd Street, Suite 200, Miami, FL 33175 (855) 414-2424

IT IS HEREBY ORDERED that the Deed to be issued hereunder is a transaction that is exempt from all transfer taxes, either state or local, and the County Recorder of Deeds is ordered to permit immediate recordation of the Judicial or Sheriff Deed issued hereunder without any exemption stamps.

DATED: Judge Michael T. Mullen

ENTER: DEC 02 2015

Circuit Court-2054

JUDGE ______________________

PIERCE & ASSOCIATES
Attorneys for Plaintiff
1 North Dearborn Street
Thirteenth Floor
Chicago, Illinois 60602
Attorney Code #91220
(312) 476-5500
1027157

# Exhibit
# ( C )

( C )

CCCO 0031-12/12/14: Answer in Civil Asset Forfeiture Proceeding

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, COUNTY DIVISION**

2015 NOV -9 AM 9:25
CIRCUIT COURT OF COOK COUNTY CHANCERY DIV. CLERK

In re the Petition of the People of the State of Illinois, ex rel. etc.
v.
GEORGE KASBOSKE & HANNAH KASBOSKE
Defendant

No. CH 10 43017

## ANSWER IN CIVIL ASSET FORFEITURE PROCEEDING (3100)

Under penalties of perjury as provided by Section 1-109 of the Code of Civil Procedure, I state the following in response to the Petition by the State's Attorney of Cook County, Illinois:

1. My name is: GEORGE KASBOSKE
2. I will accept mail at this address: *(Street Address or P. O. Box, City/State/Zip Code)* 9040 S. 85TH AVENUE, HICKORY HILLS, IL 60457
3. The nature and extent of my interest in the property sought to be forfeited is: *(Describe)* MY WIFE'S MOTHER PASSED AWAY AND LEFT THE KASBOSKE'S HER 1/3RD INTEREST IN THI PROPERTY, WHICH WAS PAID OFF IN FULL PRIOR TO CHASE LOANS.
4. I acquired my interest in the property as follows: *(State the date you acquired the property and the circumstances under which you acquired it.)* MY WIFE AND I PURCHASED THE HOUSE (1999) WITH PERSONAL FUNDS AND A LOAN FROM WASHINGTON MUTUAL. WE PAID OFF THE MORTGAGE, THEN TOOK OUT CHASE LOANS.
5. I am aware of the following persons who have an interest in the property: *(check one)* ☐ No one
   ☑ Their names and addresses are: GEORGE & HANNAH KASBOSKE AND JP MORGAN CHASE BANK. SEE #2 ABOVE. CHASE ADDRESS: 208 LASALLE ST. SUITE 814, CHICAGO, IL 60604
6. The property is not subject to forfeiture for the following reasons: *(Please review the exemptions on the reverse side of this document and state in detail why you believe one or more of them apply.)* SEE ATTACHED. ANTITRUST, 63 CIV. 3106 GEORGE AND HANNAH KASBOSKE ARE PROTECTED BY ATTACHED JUDGMENT FROM CHASE BANK AND COURTS AS II CMVA / AAMVA

(Attach extra pages if necessary)

Wherefore, I request this Court grant my relief consistent with the matters set out in this answer.

Atty. No.: PRO SE
Name: GEORGE KASBOSKE
Atty. for: GEORGE KASBOSKE
Address: 9040 S. 85TH AVENUE
City/State/Zip Code: HICKORY HILLS, IL 60457
Telephone: 708-430-5563
Email: georgekasboske4710@comcast.net

Respectfully submitted

[signature]
Claimant

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**Answer in Civil Asset Forfeiture Proceeding— CH 10 43017**

6. The property is not subject to forfeiture for the following reasons: (Please review the exemptions on the reverse side of this document and state in detail why you believe one or more of them apply.)

EXEMPTIONS FROM FORFEITURE

Sec. 8. Exemptions from forfeiture. A property interest is exempt from forfeiture under this Section if its owner or interest holder establishes by a preponderance of evidence that the owner or interest holder:

(A) (ii)

In the case of real property, is not legally accountable for the conduct giving rise to the forfeiture, or did not solicit, conspire, or attempt to commit the conduct giving rise to the forfeiture.

(B)

Had not acquired and did not stand to acquire substantial proceeds from the conduct giving rise to the forfeiture other than as an interest holder in an arm's length commercial transaction.

(E)

that the owner or interest holder acquired the interest:

before the commencement of the conduct giving rise to its forfeiture and the person whose conduct gave rise to its forfeiture did not have the authority to convey the interest to a bona fide purchaser for value at the time of the conduct.

Answer—

George and Hannah Kasboske categorically object to the Motion for Order Approving Report of

Sale and Distribution and for Possession, and for a Personal Deficiency Judgement, per (A) (ii),

(B) and (E) above due to the following reasons:

1. The stated "action to foreclose action on a note and mortgage held by Plaintiff" is

    illegal, as the law requires that the Original Note be produced, which never occurred.

2. Federal Banking Laws required proof of income, and if self-employed, must have

    proof of income for 2 years as well as 2 years of income tax returns. The

    Kasboske's had neither, and therefore, did not qualify under Federal Banking Laws

    for a loan. Chase filed the loan application without proof of income, making this a predatory

    loan.

3. Chase Bank had knowledge that the loans granted to the Kasboske's were to be used for

    personal and business usage, which goes against Federal Law regarding co-mingling of funds,

    which the Kasboske's were not aware of at the time.

4. All U.S Government agencies, insurance companies, and banks, which includes Chase Bank,

    have a Federal Judgement against them, signed into law by Robert F. Kennedy, Attorney

    General, in 1963, which precludes all parties from imposing restrictions and controls on Mr.

    Kasboske, as he is a direct descendant and is a protected class underneath the Judgment. If the

    original court would have permitted Mr. Kasboske to enter evidence previously, these matters

    would have been known at the very onset of this case. See attached 63 Civ.3106 and Illinois

    Antitrust Act S.B. 116, July 1965, of which Chase Bank and Pierce and Associates are in

    violation.

Sec. 8. Exemptions from forfeiture. A property interest is exempt from forfeiture under this Section if its owner or interest holder establishes by a preponderance of evidence that the owner or interest holder:

(A) (i) In the case of personal property, is not legally accountable for the conduct giving rise to the forfeiture, or did not acquiesce in it, and did not know and could not reasonably have known of the conduct or that the conduct was likely to occur, or

(ii) In the case of real property, is not legally accountable for the conduct giving rise to the forfeiture, or did not solicit, conspire, or attempt to commit the conduct giving rise to the forfeiture and,

(B) Had not acquired and did not stand to acquire substantial proceeds from the conduct giving rise to the forfeiture other than as an interest holder in an arm's length commercial transaction; and

(C) With respect to conveyances, did not hold the property jointly or in common with a person whose conduct gave rise to the forfeiture; and

(D) does not hold the property for the benefit of or as nominee for any person whose conduct gave rise to the forfeiture, and if the owner or interest holder acquired the interest through any such person , the owner or interest holder acquired it as a bona fide purchaser for value without knowingly taking part in the conduct giving rise to the forfeiture; and

(E) that the owner or interest holder acquired the interest:

(i) before the commencement of the conduct giving rise to its forfeiture and the person whose conduct gave rise to its forfeiture did not have the authority to convey the interest to a bona fide purchaser for value at the time of the conduct; or

(ii) after the commencement of the conduct giving rise to its forfeiture, and the owner or interest holder acquired the interest as a mortgage, secured creditor, lien holder, or bona fide purchaser for value without knowledge of the conduct which gave rise to the forfeiture; and

(a) in the case of personal property, without knowledge of the seizure of the property for forfeiture; or

(b) in the case of real estate, before the filing in the office of the Recorder of Deeds of the county in which the real estate is located of a notice of seizure for forfeiture or a lis pendens notice.

Sec. 12. Nothing in this Act shall apply to property which constitutes reasonable bona find attorney's fees paid to an attorney for services rendered or to be rendered in the forfeiture proceeding or criminal proceeding relating directly thereto where such property was paid before its seizure, before the issuance of any seizure warrant or court order prohibiting transfer of the property and where the attorney, at the time he or she received the property, did not know that it was property subject to forfeiture under this Act.

***The laws are subject to change. Please consult with a legal service provider.***

Cited
As of: Sep 07, 2007

**United States v. Association of Casualty and Surety Companies, American Mutual Insurance Alliance and the National Association of Mutual Casualty Companies.**

**Civil Action No. 63 Civ. 3106.**

**United States District Court for the Southern District of New York.**

***1963 U.S. Dist. LEXIS 9949; 1963 Trade Cas. (CCH) P70,917***

**November 27, 1963.**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff United States instituted an antitrust action against defendant automobile insurers to restrain the insurers from carrying out an independent appraisal plan. The United States and the insurers consented to a final judgment of the court.

**OVERVIEW:** The United States instituted an antitrust action against the insurers. The parties consented to the entry of a final judgment. The court held that it had jurisdiction under §§ 1, 3 of the Act of Congress of the 2nd of July, 1795, known as the Sherman Act. The judgment was final as to the insurers and others who acted in concert with them. The insurers were ordered to send a written notice within 90 days indicating that they had abandoned an independent appraisal plan. The insurers were enjoined from recommending any appraiser of damage to automobiles. They were also restrained from advising that a person refuse to do business with such entities or with repair shops. The insurers were not to exercise control over the appraisers and were not to divide customers among the appraisers. The fixing of prices for appraisals and car repairs was restrained. Each local claims managers' council charter was to be amended to incorporate the requirements of the judgment. The insurers retained their rights under the McCarran-Ferguson Act. The Department of Justice was to have access to the insurers' records. The court retained jurisdiction to make further orders to carry out the judgment.

**OUTCOME:** The court entered the consent judgment in accordance with the opinion.

**OPINION BY:** [*1] MCLEAN

**OPINION**

Final Judgment

MCLEAN, District Judge: Plaintiff, United States of America, having filed its complaint herein on October 23, 1963, and the plaintiff and the defendants, by their respective attorneys, having consented to the entry of this Final Judgment without admission by any party with respect to any issue herein;

Now, therefore, before the taking of any testimony herein, without trial or adjudication of any issue, and upon such consent, as aforesaid, it is hereby

Ordered, adjudged and decreed as follows:

I

This Court has jurisdiction of the subject matter hereof and the parties hereto and the complaint states a claim upon which relief can be granted under Sections 1 and 3 of the Act of Congress of July 2, 1890, commonly known as the Sherman Act, as amended.

II

The provisions of this Final Judgment shall be binding upon each defendant and upon its officers, directors, agents, servants, employees, committees, successors and assigns, and upon all other persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise.

III

(A) Each defendant is ordered and directed [*2] within ninety (90) days from the entry of this Final Judgment to terminate, cancel and abandon the Independent Appraisal Plan, sometimes known as the Automotive Damage Appraisal Plan, which the defendants have established and are now administering, and each defendant is enjoined from reviving, renewing or again placing into effect that plan.

(B) Defendants are ordered and directed within ninety (90) days from the entry or this Final Judgment to send a written notice, in the form attached hereto as an exhibit, stating that all defendants have terminated, cancelled and abandoned the Independent Appraisal Plan (1) to each appraiser sponsored under the Plan, (2) to each member company, and (3) to each Local Casualty Insurance Claims Managers' Council.

IV

(A) Each defendant is enjoined from placing into effect any plan, program or practice which has the purpose or effect of

(1) sponsoring, endorsing or otherwise recommending any appraiser of damage to automotive vehicles;

(2) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with (a) any appraiser of damage to automotive vehicles with respect to the appraisal of such damage, [*3] or (b) any independent or dealer franchised automotive repair shop with respect to the repair of damage to automotive vehicles;

(3) exercising any control over the activities of any appraiser of damage to automotive vehicles;

(4) allocating or dividing customers, territories, markets or business among any appraisers of damage to automotive vehicles; or

(5) fixing, establishing, maintaining or otherwise controlling the prices to be paid for the appraisal of damage to automotive vehicles, or to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

(B) Nothing in Subsection (A) above shall be deemed to prohibit the furnishing to any person or firm of any information indicating corrupt, fraudulent or unlawful practices on the part of any appraiser of damage to automotive vehicles or any independent or dealer franchised automotive repair shop, so long as the furnishing of such information is not part of a plan, program or practice enjoined in paragraphs (1) [*4] through (5) of Subsection (A) above. Each defendant shall include in any report of such information an affirmative statement that such report is not a recommendation and that the person or firm to whom such report is furnished should independently determine whether to do business with any appraiser or automotive repair shop to which the report relates.

V

Defendants are ordered and directed within ninety (90) days from the entry of this Final Judgment to cause the charter of each Local Casualty Insurance Claims Managers' Council to be amended so as to incorporate therein a declaration of policy that the Council shall not engage in any activity prohibited by Section IV of this Final Judgment.

VI

Nothing in Section IV of this Final Judgment shall be deemed to determine or constitute a waiver of any rights or immunities that defendants may have under the Act of Congress of March 9, 1945, commonly known as the McCarran-Ferguson Act.

VII

(A) For the purpose of determining and securing compliance with this Final Judgment and subject to any legally recognized privilege, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney [*5] General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant made to its principal office, be permitted.

(1) access during the office hours of such defendant to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of such defendant relating to any of the matters contained in this Final Judgment during which time counsel for such defendant may be present; and

(2) subject to the reasonable convenience of such defendant and without restraint or interference from it to interview officers or employees of such defendant, who may have counsel present, regarding any such matters.

(B) Any defendant, on the written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, shall submit within a reasonable time such reports in writing, under oath if requested, with respect to any matters contained in this Final Judgment as may be reasonably necessary for the purpose of the enforcement of this Final Judgment.

(C) No information obtained by the means provided in this Section VII shall be divulged by any representative [*6] of the Department of Justice to any person other than a duly authorized representative of the Executive Branch, except in the course of legal proceedings to which the United States of America is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

VIII

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment or for the modification or termination of any of the provisions thereof, and for the enforcement of compliance therewith and punishment of violations thereof.

Exhibit

Special Bulletin

The United States Department of Justice on , 1963, filed a complaint in the United States District Court for the Southern District of New York alleging that the Association of Casualty and Surety Companies, the American Mutual Insurance Alliance and the National Association of Mutual Casualty Companies had violated the antitrust laws.

On , 1963, a Consent Judgment was entered, having been previously agreed upon by the Department [*7] of Justice and by the attorneys for the three named defendants.

The Judgment commands, among other things, that the three defendants, their officers, directors, agents, servants, employees, committees, successors and assigns must, within ninety days of the entry of the Judgment, terminate, cancel and abandon the Independent Appraisal Plan, which has also been known as the Automotive Damage Appraisal Plan. Accordingly, this is to notify you that that plan is hereby terminated, that neither the three defendants nor anyone acting on their behalf, including the Local Casualty Insurance Claims Managers' Councils, will hereafter sponsor in any way any appraiser of damage to automotive vehicles, and that any existing sponsorship of any such appraiser is hereby withdrawn.

# Insurance Industry Committee on Motor Vehicle Administration
## About the IICMVA

About the IICMVA
State Information
Publications
Calendar of Events
Contacting Us
Members Only
Board Members
IICMVA Home

IICMVA was formally organized in January 1968. Prior to this time, various ad hoc industry committees were assembled as needed to assist with the implementation of compulsory insurance and financial responsibility laws.

Unfortunately, ad hoc committees were not effective in this type of activity because they were different in composition and inconsistent or restrictive in function. At times these ad hoc groups delayed the dissemination of information. In 1958 this situation was fully realized following a succession of ad hoc committee meetings over a period of years with the New York Department of Motor Vehicles regarding certificate of insurance procedures.

Over time it became apparent that a standing committee could provide some continuity. This committee would need to be familiar with problems that had been encountered previously in other states. In addition, the swift arrival at a solution to a problem would be aided by the standing committee's technical expertise and understanding of the background from which the problem arose. Thus was born the IICMVA.

## Composition and Function

The basic makeup of the Committee has changed since the early days. Originally, IICMVA was built around three trade associations and a group of non-affiliated, independent insurers. The three trade associations included the National Association of Independent Insurers (NAII), the Alliance of American Insurers (AAI), and the American Insurance Association (AIA). NAII and The Alliance eventually merged to form the Property Casualty Insurers Association of America (PCI).

Today the IICMVA is built around individual member insurance companies and trade associations, both of which comprise the voting members. The Committee shifted its focus in 2005 so that each participating carrier and insurance trade association could independently voice its own position on the matters at hand. This structure has led to positive growth and renewal of the IICMVA.

IICMVA is not a lobbying organization or involved in legislation. As an advisory group, it functions as a liaison between the insurance

industry and state motor vehicle departments. To encourage
attendance by state motor vehicle administrators, up to three
meetings are held each year in regions established by the American
Association of Motor Vehicle Administrators (AAMVA).

## Primary Focus

In its role as liaison between the industry and motor vehicle
administrators, IICMVA is involved with two separate but related
entities: state motor vehicle departments and AAMVA.

IICMVA primarily assists with the implementation and maintenance
of compulsory insurance and financial responsibility laws. However,
it also serves as an advisory group on the following motor vehicle
administration issues: driver licensing, vehicle titling, vehicle
registration, motor vehicle record (MVR) content, and MVR
availability.

The IICMVA has had a long and mutually beneficial association with
AAMVA. Committee members are encouraged, although not required,
to attend AAMVA conferences and workshops. In turn, the
Association is supportive of IICMVA interests: improved motor vehicle
records, single licenses for drivers, uniform title branding,
improvement of communications, and assistance with motor vehicle
department relations.

## Participating Insurance Carriers and Insurance Trade Organizations

- ACE-INA
- AIG
- Alea North America Insurance Company
- Allstate Insurance Company
- American Family Insurance Company
- American Insurance Association (AIA)
- American Modern Insurance Group
- Assurant Specialty Property
- Cincinnati Insurance Company
- CNA Insurance
- Direct General Corporation
- Employers Mutual Casualty
- Farmers Insurance Group
- Federated Insurance Company
- Fireman's Fund
- Foremost Insurance Group

- GEICO
- Liberty Mutual Group
- National Association of Mutual Insurance Companies (NAMIC)
- Nationwide Insurance Companies
- One Beacon Insurance
- The Progressive Group of Insurance Companies
- Property Casualty Insurers Association of America (PCI)
- Scottsdale Insurance
- State Farm Insurance Group
- The Hartford Insurance Group
- The Travelers Companies, Inc.
- USAA
- XL Insurance
- Zurich

## IICMVA Logo

The little red car represents the Committee's work on Motor Vehicle related issues. The car is moving forward towards the right-hand side to symbolize that the Committee keeps evolving.

The two headlight beams streaming from the car outline the Committee's two primary areas of focus: Auto Insurance and Motor Vehicle Administration.

The headlight beams form the front and back covers to three pages. These three pages represent the recommendations and best paractices the Committee members deliver as Advisors, Subject Matter Experts, and Liaisons.

About the IICMVA State Information Publications Calendar of Events Contacting Us Members Only
Board Members IICMVA Home

# STATE OF ILLINOIS

## *OFFICE OF*
## *THE SECRETARY OF STATE*

*To all to whom these Presents Shall Come, Greeting:*

**I, JESSE WHITE, Secretary of State of the State of Illinois, do hereby certify that the following and hereto attached is a true copy of Enrolled Law # 35402,** *"An Act to prohibit certain contracts, combinations, monopolies and conspiracies in restraint of trade or commerce; to exempt certain activities from provisions of the Act; to provide criminal penalties and civil remedies for violations of the Act; and to repeal certain Acts therein named"*, **approved July, 1965, originating from Record Series 103.030; Enrolled Acts of the General Assembly, from the records of the Illinois State Archives.**

*In Testimony Whereof I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois, Done at the City of Springfield this 21st day of February A.D. 2012*

Jesse White

SECRETARY OF STATE

SB 116 Mo.

An Act to prohibit certain contracts, combinations, monopolies and conspiracies in restraint of trade or commerce; to exempt certain activities from the provisions of the Act; to provide criminal penalties and civil remedies for violations of the Act; and to repeal certain Acts therein named.

Originated in the Senate Edward E. Fernandes Secretary of the Senate

<u>Be it enacted by the People of the State of Illinois, represented in the General Assembly:</u>

Section 1. This Act shall be known and may be cited as the Illinois Antitrust Act.

Section 2. The purpose of this Act is to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade, whether in manufacturing, distribution, financing, and service industries or in related for-profit pursuits.

Section 3. Every person shall be deemed to have committed a violation of this Act who shall:

(1) Make any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person:

a. for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any commodity sold or bought by the parties

"Person" shall mean any natural person, or any corporation, partnership, or association of persons.

Section 5. No provisions of this Act shall be construed to make illegal:

(1) the activities of any labor organization or of individual members thereof which are directed solely to labor objectives which are legitimate under the laws of either the State of Illinois or the United States;

(2) the activities of any agricultural or horticultural cooperative organization, whether incorporated or unincorporated, or of individual members thereof, which are directed solely to objectives of such cooperative organizations which are legitimate under the laws of either the State of Illinois or the United States;

(3) the activities of any public utility as defined in Section 10.3 of the Public Utilities Act to the extent that such activities are subject to the jurisdiction of the Illinois Commerce Commission, or to the activities of telephone mutual concerns referred to in Section 10.3 of the Public Utilities Act to the extent such activities relate to the providing and maintenance of telephone service to owners and customers.

(4) the activities (including, but not limited to, the making of or participating in joint underwriting or joint reinsurance arrangement) of any insurer, insurance agent, insurance broker, independent insurance adjuster or rating organization to the extent that such activities are subject to regulation by the Director of Insurance of this State under, or are permitted or are authorized by, the Insurance Code or any other law of this State;

(5) the religious and charitable activities of any not-for-profit corporation, trust or organization established

[illegible]

exclusively for religious or charitable purposes, or for both purposes;

(6) the activities of any not-for-profit corporation organized to provide telephone service on a mutual or co-operative basis or electrification on a co-operative basis, to the extent such activities relate to the marketing and distribution of telephone or electrical service to owners and customers;

(7) the activities engaged in by securities dealers who are (i) licensed by the State of Illinois or (ii) members of the National Association of Securities Dealers or (iii) members of any National Securities Exchange registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, in the course of their business of offering, selling, buying and selling, or otherwise trading in or underwriting securities, as agent, broker, or principal, and activities of any National Securities Exchange so registered, including the establishment of commission rates and schedules of charges;

(8) the activities of any board of trade designated as a "contract market" by the Secretary of Agriculture of the United States pursuant to Section 5 of the Commodity Exchange Act, as amended;

(9) the activities of any motor carrier of property as defined in "The Illinois Motor Carrier of Property Act", as heretofore or hereafter amended, to the extent that such activities are permitted or authorized by the Act or are subject to regulation by the Illinois Commerce Commission;

(10) the activities of any state or national bank to the extent that such activities are regulated or supervised by officers of the state or federal government under the banking laws of this State or the United States;

(11) the activities of any state or federal savings and loan association to the extent that such activities are regulated or supervised by officers of the state or federal government under the savings and loan laws of this State or the United States; or

(12) the activities of any bona fide not-for-profit association, society or board, of attorneys, practitioners of medicine, architects, engineers, land surveyors or real estate brokers licensed and regulated by an agency of the State of Illinois, in recommending schedules of suggested fees, rates or commissions for use solely as guidelines in determining charges for professional and technical services.

Section 6. Every person who shall wilfully do any of the acts prohibited by subsection (1) of Section 3 of this Act shall be guilty of a misdemeanor and shall be punished by a fine of up to $50,000, or by imprisonment not to exceed six months, or both.

(1) The Attorney General, with such assistance as he may from time to time require of the State's Attorneys in the several counties shall investigate suspected criminal violations of this Act and shall commence and try all prosecutions under this Act. Prosecutions under this Act may be commenced by complaint, information, or indictment. With respect to the commencement and trial of such prosecutions, the Attorney General shall have all of the powers and duties vested by law in State's Attorneys with respect to criminal prosecutions generally.

(2) A prosecution for any offense in violation of Section 6 of this Act must be commenced within four years after the commission thereof.

(3) The Attorney General shall not commence prosecutions under this Act against any defendant who, at the time,

is a defendant with regard to any current pending complaint, information or indictment filed by the United States for violation, or alleged violation, of the Federal Anti-Trust Statutes (including, but not being limited, Act of July 2, 1890, Ch. 647, 26 U.S. Stat. 209, 15 U.S.C.A., Secs. 1-7; Act of Oct. 15, 1914, Ch. 323, 38 U.S. Stat. 730, 15 U.S.C.A Secs. 12-27, 44; Act of August 17, 1937, Ch. 690 Title VIII 50 U.S. Stat. 693, 15 U.S.C.A. Sec. 1; Act of July 7, 1955, Ch. 281, 69 U.S. Stat. 282, 15 U.S.C.A. Secs. 1-3; Act of May 26, 1938, Ch. 283, 52 U.S. Stat. 446, 15 U.S.C.A. Sec. 13-C; and any similar Acts passed in the future) involving substantially the same subject matter.

Section 7. The following civil actions and remedies are authorized under this Act:

(1) The Attorney General, with such assistance as he may from time to time require of the State's Attorneys in the several counties, shall institute proceedings in equity in the Circuit Court to prevent and restrain violations of Section 3 of this Act. In such a proceeding, the court shall determine whether a violation has been committed, and shall enter such judgment or decree as it considers necessary to remove the effects of any violation which it finds, and to prevent such violation from continuing or from being renewed in the future. The court, in its discretion, may exercise all equitable powers necessary for this purpose, including, but not limited to, injunction, divestiture of property, divorcement of business units, dissolution of domestic corporations or associations, and suspension or termination of the right of foreign corporations or associations to do business in the State of Illinois.

(2) Any person who has been injured in his business

or property, or is threatened with such injury, by a violation of Section 3 of this Act may maintain an action in the Circuit Court for damages, or for an injunction, or both, against any person who has committed such violation. If, in an action for an injunction, the court issues an injunction, the complainant shall be awarded costs and reasonable attorney's fees. In an action for damages, if injury is found to be due to a violation of subsection (1) of Section 3 of this Act, the person injured shall be awarded three times the amount of actual damages resulting from that violation, together with costs and reasonable attorney's fees. If injury is found to be due to a violation of subsections (2) or (3) of Section 3 of this Act, the person injured shall recover the actual damages caused by the violation, together with costs and reasonable attorney's fees, and if it is shown that such violation was willful, the court may, in its discretion, increase the amount to be recovered as damages up to a total of three times the amount of actual damages. This State, any public organization organized under the authority of this State, and the United States, shall be considered a person having standing to bring an action under this subsection. Any action for damages under this subsection shall be forever barred unless commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this Act shall be revived by this Act.

JAS
DFT

SB. 116 hh

Section 8. A final judgment or decree rendered in any civil or criminal proceeding brought by the Attorney General under this Act to the effect that a defendant has violated this Act shall be prima facie evidence against such defendant in any action for damages brought by any other party against such defendant under subsection (2) of Section 7 of this Act, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: Provided, that this Section shall not apply to civil consent judgments or decrees entered before any testimony has been taken.

Section 9. No contract, combination, conspiracy, or other act which violates this Act shall constitute or be deemed a conspiracy at common law.

Section 10. Nothing in this Act shall be deemed to amend, modify, or repeal in whole or in part the provisions of "An Act to protect trademark owners, distributors, and the public against injurious and uneconomic practices in the distribution of articles of standard quality under a trademark, brand or name", approved July 8, 1935, as amended.

Section 11. When the language of this Act is the same or similar to the language of a Federal Anti-trust Law, the courts of this state in construing this Act shall follow the construction given to the Federal Law by the Federal Courts.

Section 12. The following Acts are repealed:

"An Act to provide for the punishment of persons (copartnerships or corporations forming pools, trusts and

JWS
BFT

SB 116 hh

combines, and mode of procedure, and rules of evidence in such cases", approved June 11, 1891, as amended.

"An Act to define trusts and conspiracies against trade, declaring contracts in violation of the provisions of this act void, and making certain acts in violation thereof misdemeanors, and prescribing the punishment therefor and matters connected therewith", approved June 20, 1893, as amended.

Section 13. The following named sums, or so much thereof as may be necessary, respectively, for the objects and purposes hereinafter named, are appropriated to the Attorney General to carry out the purposes of this Act as follows:

| | |
|---|---|
| For Personal Services | $150,000 |
| For contractual Services | 25,000 |
| Total | $175,000 |

Approved, July 21st 1965

Otto Kerner
Governor

Samuel H. Shapiro
President of the Senate

John P. Touhy
Speaker, House of Representatives

357

S. B. No. 116

An Act to prohibit certain contracts, combinations, monopolies and conspiracies in restraint of trade or commerce; to exempt certain activities from the provisions of the Act; to provide criminal penalties and civil remedies for violations of the Act; and to repeal certain Acts therein named.

FILED
11:30 A.M. ........ P.M.

JUL 22 1965

Paul Powell
Secretary of State.

Enrolled July 9, 1965

No. 691

Mayme Lawrence
Enrolling, Transcribing and Typing Clerk.

74th General Assembly
State of Illinois

## A special thanks to the 2014 Motor Vehicle Theft Prevention Trust Fund contributors

1st Auto & Casualty Insurance Company
21st Century (AIG) Centennial Insurance
21st Century North American
21st Century (AIG) Preferred Insurance Co.
21st Century (AIG) Premier Insurance Co.
Acuity, A Mutual Insurance Company
Addison Insurance Company
Affirmative Insurance Company
AIG Casualty Company
AIOI Nissay Dowa Ins. Co. of America
Allied Property & Casualty Insurance Co.
Allmerica Financial Alliance Insurance Co.
Allmerica Financial Benefit Insurance Co.
Allstate Fire & Casualty Insurance Company
Allstate Indemnity Company
Allstate Insurance Company
Allstate Property & Casualty Insurance Co.
Alpha Property & Casualty Insurance Co.
AMCO Insurance Company
American Access Casualty Company
American Alliance Casualty Company
American Bankers Insurance Co. of Florida
American Family Mutual Insurance Co.
American Fire & Casualty Company
American Freedom Insurance Company
American Heartland Insurance Company
American Modern Home Insurance Co.
American National General Insurance Co.
American National Property & Casualty Co.
American Reliable Insurance Company
American Select Insurance Company
American Standard Insurance of Wisconsin
American Zurich Insurance Company
Amica Mutual Insurance Company
Apollo Casualty Company
Auto Club Family Insurance Company
Auto Club Insurance Association
Auto Owners Insurance Company
Automobile Club Interinsurance Exchange
Badger Mutual Insurance Company
Bankers Standard Insurance Company
Bristol West Insurance Company
California Casualty Gen. Ins. Co. of Oregon
Capitol Indemnity Corporation
Central Mutual Insurance Company
Charter Indemnity Company
Charter Oak Fire Insurance Company
Chubb Indemnity Insurance Company
Chubb National Insurance Company
Cincinnati Insurance Company
Citizens Insurance Company of America
Citizens Insurance Company of Illinois
Columbia Mutual Insurance Company
Companion Property & Casualty Ins. Co.
Conifer Insurance Company
Consumers Insurance USA, Inc.
Country Casualty Insurance Company
Country Mutual Insurance Company
Country Preferred Insurance Company
Cumis Insurance Society, Inc.
Dairyland Insurance Company
Delphi Casualty Company
Depositors Insurance Company
Economy Fire & Casualty Company
Economy Preferred Insurance Company
Economy Premier Assurance Company
Electric Insurance Company
EMC Property & Casualty Company
Elephant Insurance Company
Emcasco Insurance Company
Employers Mutual Casualty Company
Encompass Home and Auto Insurance Co.
Encompass Insurance Company of America
Encompass Property & Casualty Company
Erie Insurance Company
Erie Insurance Exchange
Essentia Insurance Company
Esurance Insurance Company
Esurance Property and Casualty Ins. Co.
Falcon Insurance Company
Farmers Automobile Insurance Association
Farmers Mutual Hail Insurance Co. of Iowa
Federal Insurance Company
Financial Indemnity Company
Fireman's Fund Insurance Company
First Acceptance Insurance Company
First Chicago Insurance Company
First Liberty Insurance Corporation
Florists' Mutual Insurance Company
Foremost Insurance Company
Founders Insurance Company
Garrison Property & Casualty Insurance Co.
Geico Casualty Company
Geico General Insurance Company
Geico Indemnity Company
General Casualty Company of Illinois
General Casualty Company of Wisconsin
Goodville Mutual Casualty Company
Government Employees Insurance Co.
Grange Indemnity Insurance Company
Grange Mutual Casualty Company
Great Northern Insurance Company
Grinnell Mutual Reinsurance Company
Grinnell Select Insurance Company
GuideOne America Insurance Company
GuideOne Elite Insurance Company
GuideOne Mutual Insurance Company
Hallmark Insurance Company
Hallmark (State Auto) National Ins. Co.
Harleysville Lake States Insurance Co.
Hartford Accident & Indemnity Company
Hartford Casualty Insurance Company
Hartford Fire Insurance Company
Hartford Insurance Company of Illinois
Hartford Underwriters Insurance Company
Hastings Mutual Insurance Company
Horace Mann Insurance Company
Horace Mann Property & Casualty Ins.
IDS Property Casualty Insurance Company
Illinois Emcasco Insurance Company
Illinois Farmers Insurance Company
IMT Insurance Company
Infinity Assurance Insurance Company
Infinity Auto Insurance Company
Infinity Casualty Insurance Company
Infinity Insurance Company
Insurance Company of the State of PA
Interstate Bankers Casualty Company
Iowa Mutual Insurance Company
Ironshore Indemnity Inc.
Kemper Independence Insurance Company
Liberty Insurance Corporation
Liberty Mutual Fire Insurance Company
Lighthouse Casualty Company
LM General Insurance Company
LM Insurance Corporation
Loya Insurance Company
Madison Mutual Insurance Company
Massachusetts Bay Insurance Company
Member Select Insurance Company
Mendakota Insurance Company
Merastar Insurance Company
Meridian Security Insurance Company
Mercury Insurance Company of Illinois
Metropolitan Casualty Insurance Company
Metropolitan General Insurance Company
Metropolitan Group Property & Casualty
Metropolitan Property & Casualty Company
Michigan Millers Mutual Insurance Company
Midwest Family Mutual Insurance Co.
National General Assurance Company
National General Insurance Company
National General Insurance Online Inc.
National Heritage Insurance Company
National Interstate Insurance Company
National Surety Corporation
Nationwide Agribusiness Insurance Company
Nationwide Assurance Company
Nationwide Insurance Company of America
Nationwide Mutual Fire Insurance Company
Nationwide Mutual Insurance Company
NIPPONKOA Insurance Company, Limited
Ohio Casualty Insurance Company
Omni Indemnity Company
Owners Insurance Company
Pacific Indemnity Company
Pekin Insurance Company
Pharmacists Mutual Insurance Company
Philadelphia Indemnity Insurance Company
Phoenix Insurance Company
Plaza Insurance Company
Progressive Direct Insurance Company
Progressive Northern Insurance Company
Progressive Universal Ins. Co. of Illinois
Property & Casualty Insurance of Hartford
Response Insurance Company
Response Worldwide Insurance Company
Rockford Mutual Insurance Company
Safe Auto Insurance Company
Safeco Insurance Company of Illinois
Sagamore Insurance Company
Secura Insurance
Secura Supreme Insurance Company
Selective Insurance Co. of South Carolina
Selective Insurance Co. of the Southeast
Sentinel Insurance Company

Sentry Insurance, A Mutual Company
Sequoia Insurance Company
Shelter General Insurance Company
Shelter Mutual Insurance Company
Standard Fire Insurance Company
Standard Mutual Insurance Company
State Auto Property & Casualty Insurance
State Automobile Mutual Insurance Co.
State Farm Fire and Casualty Company
State Farm Mutual Automobile Ins. Co.
Stillwater Property & Casualty Ins. Co.
Teachers Insurance Company
Technology Insurance Company
Travelers Casualty Insurance Co. of America
Travelers Commercial Insurance Company
Travelers Home & Marine Insurance Co.
Travelers Indemnity Company
Travelers Indemnity Company of America
Travelers Indemnity Company of CT
Travelers Property Casualty Co. of America
Trumbull Insurance Company
Trustgard Insurance Company
Twin City Fire Insurance Company

United Automobile Insurance Company
United Equitable Insurance Company
United Fire & Casualty Company
United Services Automobile Association
United States Liability Insurance Company
Unitrin Auto & Home Insurance Company
Unitrin Direct Insurance Company
Unitrin Direct Property & Casualty Co.
Unitrin Preferred Insurance Company
USAA Casualty Insurance Company
USAA General Indemnity Company
Victoria Fire and Casualty Company
Victoria Select Insurance Company
Vigilant Insurance Company
Viking Insurance Company of Wisconsin
Wadena Insurance Company
Wesco Insurance Company
West American Insurance Company
West Bend Mutual Insurance Company
Westfield Insurance Company
Westfield National Insurance Company
Yosemite Insurance Company
Young America Insurance Company

# The Illinois Motor Vehicle Theft Prevention Act

## 20 Illinois Complied Statutes 4005

**4005/1. Short title.** This Act shall be known as the Illinois Motor Vehicle Theft Prevention Act.

**4005/2. Purpose.** The purpose of this Act is to prevent, combat and reduce motor vehicle theft in Illinois; to promote and support motor vehicle theft law enforcement, prosecution and administration of motor vehicle theft laws by establishing statewide capabilities for and coordination of financial resources.

**4005/3. Definitions.** As used in this Act

(a) "Authority" means the Illinois Criminal Justice Information Authority.

(b) "Council" means the Illinois Motor Vehicle Theft Prevention Council, established within the Authority by this Act.

(c) "Trust Fund" means the Motor Vehicle Theft Prevention Trust Fund.

**4005/4. Motor Vehicle Theft Prevention Council—Members—Chairman—Terms—Meetings.** There is hereby created within the Authority an Illinois Motor Vehicle Theft Prevention Council, which shall exercise its power, duties and responsibilities independently of the Authority. There shall be 11 members of the Council consisting of the Secretary of State or his designee, the Director of the Department of State Police, the State's Attorney of Cook County, the Superintendent of the Chicago Police Department, and the following 7 additional members, each of whom shall be appointed by the Governor: a state's attorney of a county other than Cook, a chief executive law enforcement official from a jurisdiction other than the City of Chicago, 5 representatives of insurers authorized to write motor vehicle insurance in this State, all of whom shall be domiciled in this State.

The Governor from time to time shall designate the Chairman of the Council from the membership. All members of the Council appointed by the Governor shall serve at the discretion of the Governor for a term not to exceed 4 years. The initial appointed members of the Council shall serve from January 1, 1991 until the third Monday in January, 1995 or until their successors are appointed. The Council shall meet at least quarterly.

**4005/5. Compensation of members.** Members of the Council shall serve without compensation. All members shall be reimbursed for reasonable expenses incurred in connection with their duties.

**4005/6. Personnel.** The Executive Director of the Authority shall employ, in accordance with the provisions of the Illinois Personnel Code, such administrative, professional, clerical, and other personnel as may be required and may organize such staff as may be appropriate to effectuate the purposes of this Act.

**4005/7. Powers and duties of council.** The Council shall have the following powers, duties and responsibilities:

(a) To apply for, solicit, receive, establish priorities for, allocate, disburse, contract for, and spend funds that are made available to the Council from any source to effectuate the purposes of this Act.

(b) To make grants and to provide financial support for federal and State agencies, units of local government, corporations, and neighborhood, community and business organizations to effectuate the purposes of this Act.

(c) To assess the scope of the problem of motor vehicle theft, including particular areas of the State where the problem is greatest and to conduct impact analyses of State and local criminal justice policies, programs, plans and methods for combating the problem.

(d) To develop and sponsor the implementation of statewide plans and strategies to combat motor vehicle theft and to improve the administration of the motor vehicle theft laws and provide an effective forum for identification of critical problems associated with motor vehicle theft.

(e) To coordinate the development, adoption and implementation of plans and strategies relating to interagency or intergovernmental cooperation with respect to motor vehicle theft law enforcement.

f) To promulgate rules or regulations necessary to ensure that appropriate agencies, units of government, private organizations and combinations thereof are included in the development and implementation of strategies or plans adopted pursuant to this Act and to promulgate rules or regulations as may otherwise be necessary to effectuate the purposes of this Act.

(g) To report annually, on or before April 1, 1992 to the Governor, General Assembly, and, upon request, to members of the general public on the Council's activities in the preceding year.

(h) To exercise any other powers that are reasonable, necessary or convenient to fulfill its responsibilities, to carry out and to effectuate the objectives and purposes of the Council and the provisions of this Act, and to comply with the requirements of applicable federal or State laws or regulations; provided, however, that such powers shall not include the power to subpoena or arrest.

**4005/8. Motor Vehicle Theft Prevention Trust Fund.** (a) A special fund is created in the State Treasury known as the Motor Vehicle Theft Prevention Trust Fund, which shall be administered by the Executive Director of the Authority at the direction of the Council. All interest earned from the investment or deposit of monies accumulated in the Trust Fund shall, pursuant to Section 4.1 of the State Finance Act, be deposited in the Trust Fund.

(b) Money deposited in this Trust Fund shall not be considered general revenue of the State of Illinois.

(c) Money deposited in the Trust Fund shall be used only to enhance efforts to effectuate the purposes of this Act as determined by the Council and shall not be appropriated, loaned or in any manner transferred to the General Revenue Fund of the State of Illinois.

(d) Prior to April 1, 1991, and prior to April 1 of each year thereafter, each insurer engaged in writing private passenger motor vehicle insurance coverages which are included in Class 2 and Class 3 of Section 4 of the Illinois Insurance Code [FN2] as a condition of its authority to transact business in this State, may collect and shall pay into the Trust Fund an amount equal to $1.00, or a lesser amount determined by the Council, multiplied by the insurer's total earned car years of private passenger motor vehicle insurance policies providing physical damage insurance coverage written in this State during the preceding calendar year.

(e) Money in the Trust Fund shall be expended as follows:

(1) To pay the Authority's costs to administer the Council and the Trust Fund, but for this purpose in an amount not to exceed ten percent in any one fiscal year of the amount collected pursuant to paragraph (d) of this Section in that same fiscal year.

(2) To achieve the purposes and objectives of this Act, which may include, but not limited to, the following:

(A) To provide financial support to law enforcement and correctional agencies, prosecutors, and the judiciary for programs designed to reduce motor vehicle theft and to improve the administration of motor vehicle theft laws.

(B) To provide financial support for federal and State agencies, units of local government, corporations and neighborhood, community or business organizations for programs designed to reduce motor vehicle theft and to improve the administration of motor vehicle theft laws.

(C) To provide financial support to conduct programs designed to inform owners of motor vehicles about the financial and social costs of motor vehicle theft and to suggest to those owners methods for preventing motor vehicle theft.

(D) To provide financial support for plans, programs and projects designated to achieve the purposes of this Act.

(f) Insurers contributing to the Trust Fund shall have a property interest in the unexpended money in the Trust Fund, which property interest shall not be retroactively changed or extinguished by the General Assembly.

(g) In the event the Trust Fund were to be discontinued or the Council were to be dissolved by act of the General Assembly or by operation of law, then, notwithstanding the provisions of Section 5 of the State Finance Act, any balance remaining therein shall be returned to the insurers writing private passenger motor vehicle insurance in proportion to their financial contributions to the Trust Fund and any assets of the Council shall be liquidated and returned in the same manner after deduction of administrative costs.

**4005/12. Repealer.** Sections 1 through 9 and Section 11 are repealed January 1, 2016. P.A. 97-141, eff. 7-14-11.

(Source: Public Act 86-1408, effective January 1, 1991. Amended by Public Act 89-277, effective August 10, 1995, Public Act 91-85, effective July 9, 1999, and Public Act 93-172, effective July 10, 2003. Amended by Public Act 95-0212, effective January 1, 2008)

# AAMVA ASSOCIATE MEMBERS

## Miscellaneous

**J.J. Keller & Associates Inc.**

3003 W. Breezewood Lane

PO Box 368
Neenah, WI 54957-0368
Phone: (800) 558-5011      Fax: (414) 727-7519
Contact:      Mrs. Debra Stefanski
Contact Email: dstefanski@jjkeller.com

J.J. Keller & Associates was founded in 1953 to help others with federal and state regulations and ocmpliance matters. J.J. Keller is now an integrated publisher, printer and service firm servicing over 140,000 customers and clients. J.J. Keller offers an diverse product/service line including regulatory guides, compliance manuals, reports, regulatory forms, videos, labels, signs, placards and software.

**JPMorgan Chase**

401 9th Street, NW

Suite 600
Washington , DC 20004
Phone: (757) 440-2725      Fax: (603) 719-3238
http://www.jpmorganchase.com/publicsector
Contact:      Mr. James F. Lock, III
Contact Email: james.f.lock@jpmchase.com

JPMorgan Treasury Services provides variety of financial and non-financial solutions to various Federal, State, and local government agencies across the United States to streamline payment processing and provide efficiencies in document management and data collection. We operate programs for our government clients that require us to securely process and handle confidential personal information and thus we are highly skilled at maintaining information and physical security in all of our operation centers.

JPMorgan's public sector solutions combine the use of technology and adaptable procedures with the highly regulated nature of our core banking business. Our solutions are tailored to the unique needs of government organizations in order to reduce cost, improve customer service, and meet business continuity objectives for mission critical programs.

Some examples of the programs we operate for state governments include processing payments on behalf of taxing authorities, collecting and disbursing child support payments, and operating card based solutions for a variety of need-based aid programs across the United States.

**Manheim Auctions**

P.O. Box 105356
Atlanta, GA 30348-0000
Phone: (404) 843-5389      Fax: (404) 843-5914
http://www.manheim.com/
Contact:      Ms. Berta M. Phelps
Contact Email: berta.phelps@manheim.com

Manheim Auctions is an operator of wholesale automobile auctions with 84 auctions in North America. Buying customers at Manheim auctions are licensed automobile dealers and selling customers include dealers, fleet companies, lease companies, banks, car rental organizations and manufacturers.

**MasterCard Worldwide**

2000 Purchase Street
Purchase, NY 10577-0000
Phone: (914) 249-5317      Fax: (914) 249-4208
http://www.mastercard.com
Contact:      Faye Surrette
Contact Email: Faye_Surrette@MasterCard.com

MasterCard Worldwide advances global commerce by providing a critical economic link between financial institutions, businesses, cardholders and merchants worldwide. As a franchisor, processor and advisor, MasterCard develops and markets payment solutions, processes more than 16 billion payments each year and provides industry-leading analysis and consulting services to financial institution customers and merchants. Through its family of brands, including MasterCard®, Maestro® and Cirrus®, MasterCard Worldwide serves consumers and businesses in more than 210 countries and territories. Credit and debit and acceptance has proven to be a convenient, fast and cost effective payment option for motor vehicle departments as they strive to increase customer satisfaction.

**Motor Vehicle Network**

1 Selleck Street

Suite 1A
Norwalk, CT 06855-0000
Phone: (203) 899-1700      Fax: (203) 899-1701
http://www.mvnetwork.com
Contact:      Mr. Brad Savage
Contact Email: bsavage@mvnetwork.com

The Motor Vehicle Network provides live news and information, via high-speed data transmission, on L.E.D. (moving message) signs. Software enables each motor vehicle office to display its own messages. These messages provide customers with proper instructions, urgent information or information about office procedure.

ICJIA

Illinois Criminal Justice Information Authority

300 West Adams Street, Suite 200
Chicago, Illinois 60606
Telephone: 312-793-8550
TDD: 312-793-4170
Fax: 312-793-8422
www.icjia.state.il.us

# Exhibit
# ( D )

( D )



About AAMVA/Contact Us | Online Member Directory | System Alerts | Career Center

Login

Search

Solutions & Best Practices | Events & Education | News & Publications | Members & Leaders | Government Affairs | Technology Services

Driver Licensing & Identification | Vehicle Registration & Titling | Law Enforcement

Home > Members & Leaders > About AAMVA

# Quick Facts on AAMVA History

- Col. E. Austin Baughman, commissioner of Motor Vehicles in Maryland, was elected AAMVA's first president in 1933. This position is currently known as Chair of the Board.
- After its founding in 1933, AAMVA operated under Secretariats provided by the U.S. Bureau of Public Roads.
- AAMVA's first publication, the AAMVA Bulletin, was first published in July 1936. This monthly newsletter was replaced 60 years later in 1996 with Move magazine and other electronic communication tools, such as the Web site and Yahoo! groups.
- In 1938, AAMVA employed Louis R. Morony, former commissioner of Motor Vehicles in Michigan, as a full-time executive director (now known as President & CEO) and opened a headquarters office in Washington, D.C. Funding for this development came from the US. Bureau of Public Roads, the National Conservation Bureau (later known as the Association of Casualty and Surety Companies and now known as the American Insurance Association), and the Automotive Safety Association.
- In 1938-39, AAMVA sought improved vehicle headlighting. In cooperation with the automobile industry, it participated in the development and acceptance of the sealed beam headlamp.
- Milton Dufford and Ray Martinez are the only AAMVA members to serve as chief administrator for two different jurisdictions: Dufford--Georgia and South Carolina; and Martinez--New York and New Jersey.
- Between 1951 and 1955, AAMVA took active steps to make the standard size license plate a reality. This was a joint endeavor of the Engineering and Registration Committees, in cooperation with the Automobile Manufacturers Association.
- Patricia B. "Patti" Adduci, New York, was the first female international chair of the AAMVA Board of Directors.
- In 1970, incumbent AAMVA President Douglas W. Toms was chosen by President Richard M. Nixon as the federal government's highway safety chief. On the day Toms was sworn-in by then Secretary of Transportation John A. Volpe, an executive order was implemented designating the National Highway Safety Bureau as the National Highway Traffic Safety Administration (NHTSA). Simultaneously Toms became NHTSA's first Administrator.
- At the 41st Annual International Conference, held September 1973 in Miami Beach, Florida, the International Registration Plan (IRP) was formally adopted and implemented.
- In 1938, AAMVA sought and obtained a grant from Esso Safety Foundation for the improvement of driver licensing. This grant made possible "Minimum Driver License Examination Standards" and "Standard Examination for Drivers' — the original basic standards for driver licensing work.
- Prior to 1990, AAMVA's President & CEO position (formerly known as Executive Director) was always chosen from the membership. In Feb. 1990, the Board ventured outside the membership and hired a certified association professional, John Strandquist, who remained in the postion for nine years.
- Due to the development and implementation of the Commercial Driver's License Information System (CDLIS), the AAMVA headquarters staff grew from 15 to 30 in 1986 to 70 by 1991.
- In 1996 AAMVA launched its flagship publication, MOVE.
- In 1992 AAMVA, through its member states, created the first network to track commercial driver histories, and for the first time state motor vehicle agencies had the luxury of verifying a driver's commercial driving history prior to issuing their CDL. It's known as the Commercial Driver License Information System (CDLIS).
- The first "Salty Dog Breakfast" at an AAMVA function was sponsored by the National Automobile Transporters in 1952 in Cheyenne, Wyoming. Autra (American Utility Trailer Rental Association) took it over after a few years. (U-Haul was a member of Autra during those years.) In 1958, Autra sponsored the breakfast but could not pay for it so U-Haul founder L.S. "Sam" Shoen paid the bill. The next year, AAMVA asked Shoen if U-Haul would sponsor the breakfast every year. Shoen agreed, so the U-Haul sponsorship started in 1959 and has continued year after year.

- On April 18, 1980, AAMVA signed a 4-year, $4 million contract (the largest contract in the Association's 47-year history at the time), between AAMVA and the U.S. Department of Transportation for demonstrating the International Registration System (IRIS) in six states (Minnesota, Missouri, Arkansas, Colorado, Montana, and Wyoming).

- The first birthday celebration of AAMVA, held in Chicago in September 1934 with Colonel Baughman serving as president, was highlighted by a resolution endorsing the uniform vehicle code and urging its adoption.

- One of the biggest issues AAMVA tackled in 1943-44 was the issue of the non-uniformity of the size and gauge of steel license plates. Also during the war, the 55 mph speed limit was enacted not for safety reasons, but for conservation of energy. The 1944-45 annual conferences also focused on the safety aspects of the 55 mph speed limit and discussion on speed in the post-war years began.

- Prince Edward Island began to issue photo licenses on April 1, 1972 becoming the first Canadian province to do so.

- In November 1940 the Highway Traffic Advisory Committee to the War Department was organized to provide advice on highway transport matters and to ensure state compliance in meeting the essential highway needs of the War Department. AAMVA President A.W. Bohlen and L.S. Harris, Executive Director of AAMVA were designated to represent the Association on the Committee. Harris was later designated secretary of the committee with full authority to act in all matters except those creating new policies or procedures.

- By 1941, more than 90 percent of our supply of crude rubber was in the hands of enemy forces. AAMVA was tasked with researching the possibilities of increasing our natural and synthetic rubber supply, as well as studying ways to increase life of tires through mechanical, and social changes.

- AAMVA's amputee driver training program, which began during WWII, resulted not only in complete motor vehicle driver training being taught in the Army and Navy amputee hospitals, but resulted also in the development by the Society of Automotive Engineers (at the request of the Association's special Amputee Driver Committee) of special equipment.

- At the 1950 annual conference, the Farmers Insurance Safety Foundation presented a $10,000 check to AAMVA. The check represented the first annual contribution by the Foundation for the inauguration of an in-service training course for chief driver's license examiners at the Northwestern University Traffic Institute (under the auspices of AAMVA), and the training of examiner trainers at regional workshops. In 1954, 13 chief examiners had completed the first four-year program. In 1954, the Foundation re-upped its grant for another 4-year training program, which began in 1955.

- The International Registration Plan—a program for inter-jurisdictional travel of commercial vehicles—was formally launched at the 1973 Annual International Conference with nine state signators; four for participation in 1974; five more to join in with the 1975 model vehicles. By the 1974 AIC, AAMVA also enlisted another state, and a Canadian province (the first), and saw enabling legislation enacted in two other states.

- In late 1959, AAMVA received a grant from the Insurance Institute for Highway Safety to support a special program to improve the effectiveness of driver licensing and driver improvement procedures in all jurisdictions. By 1963 recognition of the importance of good driver licensing had reached an all-time high in nearly all of the U.S. and Canadian jurisdictions.

- In 2003, AAMVA, along with its various safety partners, launched the nation's first full-scale older driver public relations campaign known as GrandDriver®.

# AAMVA ASSOCIATE MEMBERS

## Miscellaneous

**J.J. Keller & Associates Inc.**

3003 W. Breezewood Lane

PO Box 368
Neenah, WI 54957-0368
Phone: (800) 558-5011    Fax: (414) 727-7519
Contact:    Mrs. Debra Stefanski
Contact Email: dstefanski@jjkeller.com

J.J. Keller & Associates was founded in 1953 to help others with federal and state regulations and ocmpliance matters. J.J. Keller is now an integrated publisher, printer and service firm servicing over 140,000 customers and clients. J.J. Keller offers an diverse product/service line including regulatory guides, compliance manuals, reports, regulatory forms, videos, labels, signs, placards and software.

**JPMorgan Chase**

401 9th Street, NW

Suite 600
Washington , DC 20004
Phone: (757) 440-2725    Fax: (603) 719-3238
http://www.jpmorganchase.com/publicsector
Contact:    Mr. James F. Lock, III
Contact Email: james.f.lock@jpmchase.com

JPMorgan Treasury Services provides variety of financial and non-financial solutions to various Federal, State, and local government agencies across the United States to streamline payment processing and provide efficiencies in document management and data collection. We operate programs for our government clients that require us to securely process and handle confidential personal information and thus we are highly skilled at maintaining information and physical security in all of our operation centers.

JPMorgan's public sector solutions combine the use of technology and adaptable procedures with the highly regulated nature of our core banking business. Our solutions are tailored to the unique needs of government organizations in order to reduce cost, improve customer service, and meet business continuity objectives for mission critical programs.

Some examples of the programs we operate for state governments include processing payments on behalf of taxing authorities, collecting and disbursing child support payments, and operating card based solutions for a variety of need-based aid programs across the United States.

**Manheim Auctions**

P.O. Box 105356
Atlanta, GA 30348-0000
Phone: (404) 843-5389    Fax: (404) 843-5914
http://www.manheim.com/
Contact:    Ms. Berta M. Phelps
Contact Email: berta.phelps@manheim.com

Manheim Auctions is an operator of wholesale automobile auctions with 84 auctions in North America. Buying customers at Manheim auctions are licensed automobile dealers and selling customers include dealers, fleet companies, lease companies, banks, car rental organizations and manufacturers.

**MasterCard Worldwide**

2000 Purchase Street
Purchase, NY 10577-0000
Phone: (914) 249-5317    Fax: (914) 249-4208
http://www.mastercard.com
Contact:    Faye Surrette
Contact Email: Faye_Surrette@MasterCard.com

MasterCard Worldwide advances global commerce by providing a critical economic link between financial institutions, businesses, cardholders and merchants worldwide. As a franchisor, processor and advisor, MasterCard develops and markets payment solutions, processes more than 16 billion payments each year and provides industry-leading analysis and consulting services to financial institution customers and merchants. Through its family of brands, including MasterCard®, Maestro® and Cirrus®, MasterCard Worldwide serves consumers and businesses in more than 210 countries and territories. Credit and debit and acceptance has proven to be a convenient, fast and cost effective payment option for motor vehicle departments as they strive to increase customer satisfaction.

**Motor Vehicle Network**

1 Selleck Street

Suite 1A
Norwalk, CT 06855-0000
Phone: (203) 899-1700    Fax: (203) 899-1701
http://www.mvnetwork.com
Contact:    Mr. Brad Savage
Contact Email: bsavage@mvnetwork.com

The Motor Vehicle Network provides live news and information, via high-speed data transmission, on L.E.D. (moving message) signs. Software enables each motor vehicle office to display its own messages. These messages provide customers with proper instructions, urgent information or information about office procedure.

# Exhibit
# ( E )

( E )



# Insurance Industry Committee on Motor Vehicle Administration

About the IICMVA
State Information
Publications
Calendar of Events
Contacting Us
Members Only
Board Members
IICMVA Home

## About the IICMVA

IICMVA was formally organized in January 1968. Prior to this time, various ad hoc industry committees were assembled as needed to assist with the implementation of compulsory insurance and financial responsibility laws.

Unfortunately, ad hoc committees were not effective in this type of activity because they were different in composition and inconsistent or restrictive in function. At times these ad hoc groups delayed the dissemination of information. In 1958 this situation was fully realized following a succession of ad hoc committee meetings over a period of years with the New York Department of Motor Vehicles regarding certificate of insurance procedures.

Over time it became apparent that a standing committee could provide some continuity. This committee would need to be familiar with problems that had been encountered previously in other states. In addition, the swift arrival at a solution to a problem would be aided by the standing committee's technical expertise and understanding of the background from which the problem arose. Thus was born the IICMVA.

## Composition and Function

The basic makeup of the Committee has changed since the early days. Originally, IICMVA was built around three trade associations and a group of non-affiliated, independent insurers. The three trade associations included the National Association of Independent Insurers (NAII), the Alliance of American Insurers (AAI), and the American Insurance Association (AIA). NAII and The Alliance eventually merged to form the Property Casualty Insurers Association of America (PCI).

Today the IICMVA is built around individual member insurance companies and trade associations, both of which comprise the voting members. The Committee shifted its focus in 2005 so that each participating carrier and insurance trade association could independently voice its own position on the matters at hand. This structure has led to positive growth and renewal of the IICMVA.

IICMVA is not a lobbying organization or involved in legislation. As an advisory group, it functions as a liaison between the insurance

industry and state motor vehicle departments. To encourage attendance by state motor vehicle administrators, up to three meetings are held each year in regions established by the American Association of Motor Vehicle Administrators (AAMVA).

## Primary Focus

In its role as liaison between the industry and motor vehicle administrators, IICMVA is involved with two separate but related entities: state motor vehicle departments and AAMVA.

IICMVA primarily assists with the implementation and maintenance of compulsory insurance and financial responsibility laws. However, it also serves as an advisory group on the following motor vehicle administration issues: driver licensing, vehicle titling, vehicle registration, motor vehicle record (MVR) content, and MVR availability.

The IICMVA has had a long and mutually beneficial association with AAMVA. Committee members are encouraged, although not required, to attend AAMVA conferences and workshops. In turn, the Association is supportive of IICMVA interests: improved motor vehicle records, single licenses for drivers, uniform title branding, improvement of communications, and assistance with motor vehicle department relations.

## Participating Insurance Carriers and Insurance Trade Organizations

- ACE-INA
- ARCH Insurance Group
- Allstate Insurance Company
- American Family Insurance Company
- American Insurance Association (AIA)
- American Modern Insurance Group
- Amica Mutual
- Canal Insurance
- Chartis Insurance
- Cincinnati Insurance Company
- CNA Insurance
- Direct General Corporation
- Employers Mutual Casualty
- Farmers Insurance Group
- Federated Insurance Company

- Fireman's Fund
- Foremost Insurance Group
- GEICO
- Horace Mann Insurance Group
- Infinity Insurance
- Liberty Mutual Group
- Lincoln General
- National Association of Mutual Insurance Companies (NAMIC)
- Nationwide Insurance Companies
- One Beacon Insurance
- The Progressive Group of Insurance Companies
- Property Casualty Insurers Association of America (PCIAA)
- Scottsdale Insurance
- State Farm Insurance Group
- The Hartford Insurance Group
- The Travelers Companies, Inc.
- United America
- USAA
- XL Insurance
- Zurich
- 21st Century

## Associate Members

- ACORD
- AAMVA
- HDI
- Insure Rite
- Verisk Analytics
- IVANS
- LexisNexis
- MV Verisol
- Pasco/Validati
- RL Polk
- TML Information Services

## IICMVA Logo

The little red car represents the Committee's work on Motor Vehicle

related issues. The car is moving forward towards the right-hand side to symbolize that the Committee keeps evolving.

The two headlight beams streaming from the car outline the Committee's two primary areas of focus: Auto Insurance and Motor Vehicle Administration.

The headlight beams form the front and back covers to three pages. These three pages represent the recommendations and best paractices the Committee members deliver as Advisors, Subject Matter Experts, and Liaisons.

About the IICMVA State Information Publications Calendar of Events Contacting Us Members Only
Board Members IICMVA Home



# Insurance Industry Committee on Motor Vehicle Administration

## The IICMVA

- About the IICMVA
- State Information
- Publications
- Calendar of Events
- Contacting Us
- Members Only
- Board Members
- IICMVA Home

The Insurance Industry Committee on Motor Vehicle Administration (IICMVA) is an all-industry advisory group formed in January 1968 as the official liaison between the insurance industry and Motor Vehicle Departments in the US and Canada. The need for such a committee was identified when the American Association of Motor Vehicle Administrators (AAMVA) adopted a resolution that an industry committee be formed to work with motor vehicle administrators on matters affecting mutual interests. To find out more, click on the following link: **About the IICMVA**.

## Mission Statement

Subject to applicable law and regulations, the Committee's purpose is to:

- develop and maintain a close working liaison with AAMVA
- act as a central body through which interested parties can submit their problems with respect to the administration of compulsory insurance laws, financial responsibility laws, or other motor vehicle related matters
- facilitate a more expeditious handling of these problems as they arise
- coordinate the dissemination of information from the State Motor Vehicle Departments and Insurance Departments to all insurers

## Antitrust Statement

IICMVA meets three to four times each year throughout the AAMVA Regions to give local Motor Vehicle Administrators an opportunity to meet with the Committee. Special meetings are also called from time to time as the need arises. The following antitrust statement is read by an officer prior to any meeting or industry discussion:

As members of the Insurance Industry Committee on Motor Vehicle Administration or participants in this meeting, we need to be mindful of the constraints of the antitrust laws. There shall be no discussions of agreements of concerted actions that may restrain competition, such as price fixing, boycotts, refusals to deal or allocations of markets. This prohibition includes the exchange of

information concerning individual company rates, coverages, market practices, claims settlement practices, or any other competitive aspect of an individual company's operation. Each member or participant is obligated to follow the published agenda and to speak up immediately for the purpose of preventing any discussion falling outside the bounds indicated. Please refer to the more detailed antitrust preamble included with the materials for this meeting.

The antitrust statement is an abbreviated version of the formal declaration adopted by the Committee. Members and participants are advised to review and abide by the formal antitrust declaration: IICMVA Antitrust Declaration.

About the IICMVA State Information Publications Calendar of Events Contacting Us Members Only
Board Members IICMVA Home



# Insurance Industry Committee on Motor Vehicle Administration
## IICMVA Antitrust Declaration

About the IICMVA
State Information
Publications
Calendar of Events
Contacting Us
Members Only
IICMVA Home

The purpose of IICMVA is to discuss, monitor and provide input on laws, regulations and procedures applicable to the state agencies responsible for motor vehicle administration affecting the insurance industry, and to develop communications to ensure insurance companies are aware of these requirements. Antitrust and unfair competition laws exist in all states and in federal law, and are designed to promote free and open competition in the marketplace for goods and services. These laws forbid individuals and organizations such as ours from agreeing to restrain marketplace competition or other behavior regarded as unfair competition.

Consequently, IICMVA members and meeting participants will discuss only the business of the IICMVA as set forth in the agenda for this meeting. The meeting will be conducted in strict adherence to the requirements and prohibitions of federal and state antitrust laws. IICMVA members and meeting participants will not engage in discussions, either at this meeting or in private conversations, of our individual companies' business plans or any activities or concerted responses to market issues. There shall be no discussions of agreements or concerted actions that may restrain competition, such as price fixing, boycotts, refusals to deal or allocations of markets. Specifically, members of IICMVA are advised to avoid exchanging or discussing, either directly or indirectly through an intermediary, the following matters in any oral discussions or written correspondence with other members or with any other person from another company:

i. current or future rates, discounts, surcharges, rate structures or classifications, insured losses, profit, expenses or other costs of doing business; current or future product design or coverage; any current or future terms of sale or other marketing practices; current or future underwriting practices or eligibility for insurance; or any other aspects of the operations of any individual company;

ii. prices or labor rates charged by, or boycotting or refusing to deal with certain, suppliers or service providers for the insurance industry (including, but not limited to, doctors and other health care providers, roofers and other members of the construction industry, auto body or glass repair shops, lawyers, adjustors, appraisers, experts);

iii. any forms of joint or cooperative action by insurers, particularly

action which may have an adverse affect on any person, other than actions permitted under state or federal antitrust laws, such as providing notices of, or comments (including estimated costs of compliance) and position statements to legislative or regulatory bodies on, laws, rules or regulations relating to motor vehicle administration issues (including, but not limited to, financial responsibility, compulsory security, driver licensing, motor vehicle records, title, registration, and state reporting requirements).

All participants in any discussion are obliged to follow the published agenda and to speak up immediately for the purpose of preventing any discussion from going beyond the bounds indicated by these guidelines. Participants are also further advised to raise questions they may have about these guidelines prior to engaging in any questionable discussions.

About the IICMVA  State Information  Publications  Calendar of Events  Contacting Us  Members Only

IICMVA Home

# Exhibit
# ( F )

( F )

## BACKGROUND

Three trade associations beginning in or about 1940 (Association of Casualty and Surety Companies, American Mutual Insurance Alliance, and the National Association of Mutual Casualty Companies) formed a committee (CCC) to control automotive repairs covered by the association's member insurance companies.

## INSURANCE AS COMMERCE

The first step toward its attainment was the organization in May, 1945, at a joint meeting of the Federal Legislation Commission of the National Association of Insurance Commissioners and outstanding representatives of the insurance companies, of a committee designated as the All-Industry Committee .Cooperating with the Industry was a special committee of the Insurance section of the American Bar Association, appointed in 1946.

The mountainous All-Industry Committee labored and brought forth the draft of two monumental pieces of legislation for enactment by the States, identified as the Casualty and Surety Rate Regulatory Bill, which provide for state supervision of rating activities for various types of property insurance, casualty insurance and surety insurance. The bills provide that rates must conform to prescribed standards; that they shall not be excessive, inadequate or unfairly discriminatory; that rate manuals and plans shall be filed with the Insurance Commissioner, who is directed to review such filings as soon as reasonably possible.

## FEDERAL CONSENT DECREE JUDGMENT

As a result of the CCC's controlling practices, from the 1940's - 1963, on behalf of independent garage owners, the United States sued these three insurance associations resulting in a Consent Decree Judgment ("CDJ") signed by then US Attorney General Robert Kennedy. The judgment enjoins the Defendants, their Successors, or anyone acting in concert and participation with same, from placing into effect any plan, program or practice which has the purpose or effect of:
- exercising any control over the activities of any appraiser of damage to automotive vehicles;
- Anti-Trust Statement. The CDJ also requires the defendants/successors to read an anti-trust statement whenever they gather or meet.

The CDJ had the immediate effect of eliminating the CCC and its operations. However, just a few years later the original defendants evolved into successor associations. For the successors to create another committee like CCC to control the independent garage owners would be an obvious violation of the CDJ.

**CONCERT AND PARTICIPATION, AND CONTROLLING ACTIVITIES**

Instead, as an attempt to circumvent the CDJ, the successor organizations established a joint government-private Insurance Association (IICMVA) to influence and lobby the (AAMVA) governments of the 50 states and Canada to perform the controlling activities which the successors were enjoined from doing themselves.

To this day, during IICMVA/AAMVA meetings the anti-trust statement required by the 1963 CDJ is still read, and the anti-trust statement is posted on IICMVA website. On the surface, to those unaware of the CDJ, the activities of the 50 states and local governments have the appearance of being independent legislators, regulators, and creators of plans, practices, and programs. However, the state and local governments of Illinois are in fact acting "in concert and participation" with the successors to the CDJ and exercising control over the activities of appraisers of damage to motor vehicles – with monopolistic and oligarchic actions which are enjoined by the CDJ.

**LINEAGE**

**Lineage of Defendants – 1963 Consent Decree**

**Defendant #1 – Association of Casualty and Surety Companies (ACSC)>(AIA)**
110 William St. NY NY - Unincorporated Trade Association whose members are composed of 133 stock insurance companies doing business in the USA.

In 1964 ACSC merged with the American Insurance Association and the National Board of Fire Underwriters to become American Insurance Association (AIA).
AIA is currently the leading property and casualty insurance trade organization, representing more than 370 insurers that write more than $77 billion in premiums each year.

AIA is currently a member of IICMVA.

**Defendant #2 – American Mutual Insurance Alliance (AMIA) > (AAI) > (PCI)**

20 N. Wacker Dr. Chicago, IL - IL Corporation. A trade association whose membership is composed of 106 Mutual Insurance Companies doing business in the USA.
1947-1956 – American Mutual Alliance[1]
1957 – American Mutual Insurance Alliance[1]. Articles of Incorporation of AMA Amended to change name to AMIA.

1965 – Articles amended adopting new clauses prescribed by the "General Not For Profit Corporation Act" of Illinois.
1977 – Articles amended to change name of AMIA to Alliance of American Insurers (AAI).
2004 –Alliance of American Insurers and National Association of Independent Insurers merged to form Property Casualty Insurers Association of America (PCI).

PCI is currently a member of IICMVA.

**Defendant #3 – National Association of Mutual Casualty Companies (NAMCC)** 20 N. Wacker Dr. Chicago, IL - IL Corporation. A trade association whose membership is composed of 26 Mutual Insurance Companies doing business in the USA.
*All members of NAMCC, which write automobile property insurance, are also members of AMIA.*
1917- 2000 National Association of Mutual Casualty Companies
2000 - Dissolved in 2000 retroactively effective January 1, 1987.

Property Casualty Insurers Association of America (PCI).

**Insurance Industry Committee on Motor Vehicle Administration (IICMVA)**
Formed in January 1968
Both defendants #1 and #2 are currently members.

IICMVA consists of representatives from the three property/casualty trade associations, their affiliated member companies and independent companies. Its members write most of the motor vehicle and commercial insurance in the United States.

---

[1] Certified documents of record from Illinois Secretary of State

The IICMVA is not a lobbying organization nor is it involved in legislation. Its function is to be a liaison between the insurance industry and state motor vehicle departments.

The IICMVA advises and assists these agencies in the implementation of laws such as those relating to financial responsibility, compulsory security, driver licensing and motor vehicle records.

**American Association of Motor Vehicle Administrators (AAMVA).**

**National Conference of State Legislatures - (Member of AAMVA)**
7700 East First Place
Denver, CO 80230-0000
Phone: (303) 364-7700 Fax: (303) 364-7800
http://www.ncsl.org
Contact: Mr. James B. Reed
Contact Email: jim.reed@ncsl.org
NCSL supplies research and information to state legislatures on a variety of issues including those related to motor vehicle registration, driver licensing and related transportation topics.

State Farm
Farmers
CarFax – R.L. Polk
Experian
Black Book
Kelley Blue Book
Manheim Auctions
Quest Information Systems

**Lineage of Defendants – 1963 Consent Decree**

**Defendant #1 – Association of Casualty and Surety Companies (ACSC)>(AIA)**
110 William St. NY NY - Unicorporated Trade Association whose members are composed of 133 stock insurance companies doing business in the USA.

In 1964 ACSC merged with the American Insurance Association and the National Board of Fire Underwriters to become American Insurance Association (AIA).
AIA is currently the leading property and casualty insurance trade organization, representing more than 370 insurers that write more than $77 billion in premiums each year.

AIA is currently a member of IICMVA.

**Defendant #2 – American Mutual Insurance Alliance (AMIA) > (AAI) > (PCI)**
20 N. Wacker Dr. Chicago, IL - IL Corporation. A trade association whose membership is composed of 106 Mutual Insurance Companies doing business in the USA.
1947-1956 – American Mutual Alliance

1957 – American Mutual Insurance Alliance[1]. Articles of Incorporation of AMA Amended to change name to AMIA.
1965 – Articles amended adopting new clauses prescribed by the "General Not For Profit Corporation Act" of Illinois.
1977 – Articles amended to change name of AMIA to Alliance of American Insurers (AAI).
2004 –Alliance of American Insurers and National Association of Independent Insurers merged to form Property Casualty Insurers Association of America (PCI).

PCI is currently a member of IICMVA.

**Defendant #3 – National Association of Mutual Casualty Companies (NAMCC)** 20 N. Wacker Dr. Chicago, IL - IL Corporation. A trade association whose membership is composed of 26 Mutual Insurance Companies doing business in the USA.
*All members of NAMCC, which write automobile property insurance, are also members of AMIA.*
1917- 2000 National Association of Mutual Casualty Companies
2000 - Dissolved in 2000 retroactively effective January 1, 1987.

Property Casualty Insurers Association of America (PCI).

**Insurance Industry Committee on Motor Vehicle Administration (IICMVA)**
Formed in January 1968
Both defendants #1 and #2 are currently members.

IICMVA consists of representatives from the three property/casualty trade associations,

their affiliated member companies and independent companies. Its members write most of the motor vehicle and commercial insurance in the United States.

The IICMVA is not a lobbying organization nor is it involved in legislation. Its function is to be a liaison between the insurance industry and state motor vehicle departments.

The IICMVA advises and assists these agencies in the implementation of laws such as those relating to financial responsibility, compulsory security, driver licensing and motor vehicle records.

**American Association of Motor Vehicle Administrators (AAMVA).**

**National Conference of State Legislatures - (Member of AAMVA)**
7700 East First Place
Denver, CO 80230-0000
Phone: (303) 364-7700 Fax: (303) 364-7800
http://www.ncsl.org
Contact: Mr. James B. Reed
Contact Email: jim.reed@ncsl.org
NCSL supplies research and information to state legislatures on a variety of issues including those related to motor vehicle registration, driver licensing and related transportation topics.

State Farm
Farmers
CarFax – R.L. Polk
Experian
Black Book
Kelley Blue Book
Manheim Auctions
Quest Information Systems

**Insurers Who Signed 1963 Consent Decree**
Beyond Parts and Equipment Columbus, OH 614-793-8480 HYPERLINK "http://www.beyondparts.com" www.beyondparts.com

(January 1969)
Independent Garage Owners of America, Inc. 624 S. Michigan Ave. Chicago, IL 60605.
Independent Garage Owners of Illinois 1618 S. Pulaski Chicago, IL 60623

Automotive Service Industry Association 168 N. Michigan Ave. Chicago, IL 60601. (*now Automotive Aftermarket Industry Association*) 7101 Wisconsin Ave. Suite 1300, Bethesda, MD 20814 Phone: 301-654-6664, Fax: 301-654-3299, E-mail: HYPERLINK "mailto:aaia@aftermarket.org" aaia@aftermarket.org
Certified documents of record from Illinois Secretary of State

# Exhibit
# ( G )

( G )



United States Of America
V.
Association Of Casualty And Surety Companies,
American Mutual Insurance Alliance,
National Association Of Mutual Casualty Companies
1963 CIV 3106 Consent Decree
Defendants
American Mutual Insurance Alliance (A M I A)
Association Of Casualty And Surety Companies, (A C S C)
National Association Of Mutual Casualty Companies (N A M C C)
American Insurance Association (A I A)
American Association Of Motor Vehicle Administrators (A A M V A)
Insurance Industry Commitee On Motor Vehicle Administration (I I C M V A)
State Motor Vehicle Departments
(A A M V A) CHASE BANK NA
Beneficiaries Are:
(I G O A), (I G O I), State Chapters, Among Others

George Kasboske, Member & Director Of The (I G O I):
Appraiser In The Automotive Area For Over 50 Years:
Some Of My Activities, Inventor Of 52 Patents, Some World Wide:

Defendants, Successors & Beneficiaries

In 1963, the 63 Civ. 3106 Consent Decree came into effect, which resulted from
the UNITED STATES OF AMERICA Plaintiff, v. ASSOCIATION OF CASUALTY AND
SURETY COMPANIES (ACSC); AMERICAN MUTUAL INSURANCE ALLIANCE (AMIA);
and NATIONAL ASSOCIATION OF MUTUAL CASUALTY COMPANIES (NAMCC);
Defendants.

ACSC became known as AIA.

From Quick Facts on AAMVA History (partial): In 1938...Funding for the (AAMVA
headquarters) development came from the US. Bureau of Public Roads, the
National Conservation Bureau (later known as the Association of Casualty and
Surety Companies, "ACSC", and now known as the American Insurance
Association, "AIA"), and the Automotive Safety Association.

Per IIMVA's website, under Composition and Function (partial): "The basic
makeup of the Committee has changed since the early days. Originally, IICMVA
was built around three trade associations and a group of non-affiliated,
independent insurers. The three trade associations included the National
Association of Independent Insurers (NAII), the Alliance of American Insurers
(AAI), and the American Insurance Association (AIA).

Today the IICMVA is built around individual member insurance companies and
trade associations, both of which comprise the voting members.

In its role as liaison between the industry and motor vehicle administrators,
IICMVA is involved with two separate but related entities: state motor vehicle
departments and AAMVA.

See full IICMVA Antitrust Declaration attached.

Chase Bank NA is a member of AMMVA, which is a member of IIMVCA, and are
successors to the 63 Civ. 3106 Judgment.

Beneficiaries of the Judgment are:

IGOA (Independent Garage owners of America), IGOI (Independent Garage
Owners of Illinois), state chapters, affiliates, and others, and George Kasboske
— Member IGOI.

In the IIMCVA Antitrust Declaration, and in the Consent Decree, upon which it is

based, it prevents against control of an appraiser, which Chase Bank NA is bound by, it agreed (partially) that:

II. The provisions of this Final Judgment shall be binding upon each defendant and upon its officers, directors, agents, servants, employees, committees, successors and assigns, and upon all other persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise.

III. (A) Each defendant is ordered and directed within ninety (90) days from the entry of this Final Judgment to terminate, cancel and abandon the Independent Appraisal Plan, sometimes known as the Automotive Damage Appraisal Plan, which the defendants have established and are now administering, and each defendant is enjoined from reviving, renewing or again placing into effect that plan.

IV. (A) Each defendant is enjoined from placing into effect any plan, program or practice which has the purpose or effect of: (3) exercising any control over the activities of any appraiser of damage to automotive vehicles;

George Kasboske, an Appraiser, and Beneficiary of 63 Civ. 3106, is a member of IGOI, a state chapter of IGOA.

By listing George Kasboske's (appraiser) patents as being owned by Chase Bank NA, without George Kasboske's knowledge or approval, Chase Bank placed into effect a plan to control his patents, that constitutes Wire Fraud and violations of the Sherman Act, which prohibits restraint of trade. In this manner, Chase Bank NA exercised control over George Kasboske's activities, which is what it agreed not to do.

Kasboske History

My name is George Kasboske. I am a Director of the Independent Garage owners of Illinois and a beneficiary of 63 Civ. 3106.

I began to learn to do collision repair with my father, Clem B. Kasboske, watching him at about the age of 13, learning how to do body work in 1959 at Loeber Motors here in Chicago. And then, in 1961, I began appraising automobiles. Thereafter, I started my own Welco Gas Station, where I did mechanical repairs, and body work and painting.

Afterwards, I opened up my own body shop in 1964 in Chicago, and in 1974, I became manager of my brother's body and fender shop. Then, I opened Huron Auto Body in 1984, renting from Vic Kral and his uncle, Frank Stepanek, who opened a Ziebart rustproofing franchise in downtown Chicago (under SKM Orleans Corp. SKM stands for Stepanek, Kral, and Miroballi).

Frank was the 2nd Vice President of the Independent Garage Owners of America (IGOA) 1963, a member of the Independent Garage Owners of Illinois (IGOI) 1959, and owned Stepanek Auto Rebuilders, Inc., which operated one of the original Ziebart franchises in the U.S., and is now known as True Line Inc.and True-Line Auto Sales, Inc.

I assisted Vic and Frank with selling Ziebart vehicle services, and also did body work (rust repair) and appraisals for them (under Huron Auto Body, my business), and later was employed by them (under SKM Enterprises, Inc. SKM stands for Stepanek, Kral, and Miroballi). Hannah, his wife, was also employed by them.

It was Frank Stepanek who spearheaded the effort against anti-trust actions.

Also, in 1984, Quintech Corporation was formed by me and Vic Kral, among others, for the purposes of promoting my rare and highly unique patents, which eventually were being promoted by K-Tech R & D Corporation and Stealth Light

Corporation, who are assignees of his patents.

In 2001, General Motors Corporation licensed Stealth Light Corporation, which owned numerous vehicle lighting patents, resulting from my ideas.

Recently, Chase Bank illegally claimed other patents in my name as its property, without due process. In fact, I have proof of these claims from website pictures, which have since been scrubbed off the website by Chase Bank NA. As a result, Chase Bank violated George Kasboske's due process rights and his companies' due process rights in an effort to control him and them, which Chase Bank agreed not to do under the Judgement, which prevents against control, and separately and collectively under the Sherman Act, which prevents against anti-trust activities.

Chase Bank NA, the states, insurance companies, members of the judiciary and others, who were Defendants / Descendants in the '63 Consent Decree, are also members of AAMVA (American Association Of Motor Vehicle Administrators) and IIMVCA (Insurance Industry Committee On Motor Vehicle Administration), and are descendant companies / entities of the perpetual decree which prevented the imposition of control, taxes and insurance to descendants of the decree, which include Frank Stepanek, Leonard Kral, Vic Kral and George Kasboske, among others.

# Exhibit
# ( H )

( H )

10-27157

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT - CHANCERY DIVISION**

AM 8:54

| | |
|---|---|
| JPMORGAN CHASE BANK, NATIONAL ASSOCIATION<br><br>PLAINTIFF<br><br>-vs-<br><br>GEORGE KASBOSKE; HANNAH KASBOSKE; JPMORGAN CHASE BANK, NA;<br><br>DEFENDANTS | CASE NO. 10 CH 43017<br><br>9040 SOUTH 85TH AVENUE<br>HICKORY HILLS, IL 60457<br><br>CALENDAR 60 |

**DEFENDANTS' ANSWER TO PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR ORDER APPROVING REPORT OF SALE AND DISTRIBUTION AND POSSESSION**

NOW COME the Defendants, George Kasboske and Hannah Kasboske, by and through their Pro Se Attorney, George Kasboske, and in reply to Plaintiff's November 19, 2015 Motion.

The Plaintiff, JPMORGAN CHASE BANK, NATIONAL ASSOCIATION (hereinafter Chase Bank NA), made a motion for an order approving the acquisition of the sale of George and Hanna Kasboske's property in answer to the Civil Asset Forfeiture Proceedings, but it is clear that Chase Bank NA and the Courts are acting in Concert and Participation under the Insurance Industry Committee On Motor Vehicle Administration ( I I C M V A ) and American Association Of Motor Vehicle Administrators ( A A M V A ), either knowingly or unknowingly, which is part of the Anti-Trust 63 Civ. 3106 Consent Decree, the Illinois Anti-Trust Act S.B. 116, 20 I L C S 4005, and the Sherman Act, which prohibit them from monopolistic and oligarchic practices.

Chase Bank NA and the Judiciary System are members of I I C M V A and A A M V A, which are descendants under 63 Civ. 3106. Furthermore, they have a Judgment entered against them, and cannot act against George and Hannah Kasboske, as all Judicial Proceedings are illegal. As such, they are in conflict

of interest, contempt of court, and are in violation of the terms of the Injunction.

1. In Chase Bank NA's response to filing with the Clerk of the Circuit Court of Cook County, Chicago, Illinois, on 11-19-15, it apparently did not read the Antitrust Statement that was included in the answer to Defendant's ANSWER IN CIVIL ASSET FORFEITURE PROCEEDING, filed with the Clerk of the Circuit Court on November 9, 2015.

In fact, the Plaintiff further states that Defendant "does not state a basis upon which this Court can refuse to confirm the sale of the Property". This is not true, as the Defendant clearly stated in # 6 of its ANSWER IN CIVIL ASSET FORFEITURE PROCEEDING, that, "The Property is not subject to forfeiture for the following reasons: Antitrust, 63 Civ 3106. George and Hannah Kasboske are protected by attached Judgment from Chase Bank and Courts as I I C M V A / A A M V A."

The above cited Laws over-ride PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR ORDER APPROVING REPORT OF SALE AND DISTRIBUTION AND FOR POSSESSION with respect to its statements and any other laws, per its November 19, 2015 submission. As such, Mr. Kasboske is a beneficiary and is protected through the perpetual 63 Civ. 3106 Consent Decree, and is a Director of the Independent Garage Owners of Illinois ( I G O I ), the State Association, (per Secretary of State Records), which was operating under the National Association, the Independent Garage Owners of America ( I G O A ). In addition, Mr. Kasboske is a long-time appraiser of automobiles, and was at the time of the Chase Bank NA loans, and is a long-time inventor. As such, he is exempt from insurance, taxes and control from Chase Bank NA.

In an effort to control and regulate Mr. Kasboske, Chase Bank NA took it upon itself to

illegally claim U. S. patents issued in Mr. Kasboske's name as Chase Bank NA's property, without authorization or due process, which violates his activities and rights, and his companies' activities and rights under 63 Civ. 3106 Consent Decree, and constitutes Wire Fraud under 18 U.S.C. § 1343 and 18 U.S.C. § 2701. (See below codes, and attached website photos, which confirm Chase Bank NA's alleged ownership of the Kasboske patents and its fraudulent actions. Website has since been scrubbed in a failed attempt to conceal the fraud). In so doing, Chase Bank NA continues to violate the Sherman Act, which stands alone, while it engaged in restraint of trade by claiming patents that the bank did not own, nor can acquire.

18 U.S.C. § 1343 (attached) provides: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both [2]. Also, see 18 U.S.C. § 2701 (attached), which prevents unauthorized electronic access, and 15 U.S. Code § 1 - Trusts, etc., in restraint of trade illegal; penalty (see attached), which says in part, "Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation,..."

2. For the above reasons and others (Chase Bank NA never produced the Original Note and Due Process was not followed), Chase Bank NA is violating George and Hannah Kasboske's

activities and due process rights, which is why the sale and eviction cannot be confirmed. Furthermore, the Defendants meet the Plaintiff's so-called narrow window of "limited bases for which a Defendant may object to a judicial sale", which shows that Chase Bank NA was and is still in violation of 63 Civ. 3106.

Finally, Plaintiff falsely states to the Court on Page 2 of 3, that "there is no basis under §1588 ( b ) in which this court can refuse to confirm the sale". Defendant has clearly shown that Chase Bank NA has made wanton and reckless accusations and has gone to the extent of committing Wire Fraud, in an effort to control and regulate Mr. Kasboske's activities, which it had agreed under the Judgment that it would not do.

Chase Bank NA's acts of conversion, representations and claiming rights to ownership against an appraiser are subject to fraud perpetrated by itself, and in licensees' combinations, upon George and Hannah Kasboske, as Chase Bank NA has violated the following §1508 ( b ) terms: ( ii ) the terms of sale were unconscionable and ( iii ) the sale was conducted fraudulently (as the mechanic's lien sale was conducted fraudulently against a mechanic's lien appraiser) and ( iv ) justice was otherwise not done, as the Kasboske's have met the burden to support finding against the sale under the collective bargaining laws, including the 1920 Merchant Marine Act (Chapter 24 only attached as a summary), among others. Per above arguments, the Kasboske's have loudly demonstrated the clarity the Plaintiff seeks, and why the sale must be vacated.



NOTICE THE RED DARTS, THESE ARE THE FEDERALLY CONTROLLED INTELLECTUAL PATENTED PROPERTY THAT PIERCE & ASOCIATES CLAIMED AS CHASE BANK PROPERTY, OWNED BY PRIVATE CORPORATE STOCKHOLDERS.

# K-TECH RESEARCH AND DEVELOPMENT CORPORATION AND STEALTH LIGHT CORPORASTIONS DOCUMENT 1242013

Container for flowable material - Patent Buddy
www.patentbuddy.com/Patent/7600653
Oct 13, 2009 - **Kasboske**, George, 2820 N. Whipple, Chicago, IL 60618, 10, 15 ... JPMORGAN **CHASE BANK**, NA: 119 (0.58%). SONOCO DEVELOPMENT ...

9040 S 85th Ave, Hickory Hills, Illinois 60457-1323 - Re...
cook.dailyherald.il-foreclosure.com/property/cook/.../9040-s-85th-ave
9040 S 85th Ave, Hickory Hills, 23 02 103 008 0000, Chase Home Finance Llc ... Jp Morgan **Chase Bank**, Hickory Hills, 092707, George, **Kasboske**, S 85th Ave ...

[PDF] FOR THE NORTHERN DISTRICT OF ILLINOIS E...
classaction.kccllc.net/.../3-8-13%20HELOC%20MDL%20Final%20Appr...
Mar 8, 2013 - In re: JP Morgan **Chase Bank** Home ) MDL No. 2167 ... ("Chase" or "Defendant") on the other. (Dkt. 127.) ..... 1327089501 **KASBOSKE** GEORGE.

Patent US6601981 - Headlight assembly - Google Pate...
www.google.com.mx/patents/US6601981
US4586116 *, 21 Sep 1984, 29 Apr 1986, **Kasboske** George C, Vehicle .... Owner name: JPMORGAN **CHASE BANK**, N.A., AS ADMINISTRATIVE AGENT.

Patent US4738359 - Cigarette carton assembly - Goog...
www.google.com.mx/patents/US4738359
... George **Kasboske**, Packaging system for an object and method of packaging an ... Owner name: JPMORGAN **CHASE BANK**, N.A., AS COLLATERAL AGENT, NE ... Owner name: JP MORGAN **CHASE BANK** 270 PARK AVENUENEW YORK, ...

Hickory Hills, Illinois (IL 60457) profile: population, map...
www.city-data.com/city/Hickory-Hills-Illinois.html
TCF National Bank: Hickory Hills Branch #2108 at 9357 South Roberts Road, branch ... Holding Company: Metropolitan Bank Group, Inc. JPMorgan **Chase Bank**, ...... Jean Zhang (9);

Patent US4738359 - Cigarette carton assembly - Goog...
www.google.com.mx/patents/US4738359
... George **Kasboske**, Packaging system for an object and method of packaging an ... Owner name: JPMORGAN **CHASE BANK**, N.A., AS COLLATERAL AGENT, NE ... Owner name: JP MORGAN **CHASE BANK** 270 PARK AVENUENEW YORK,

Hickory Hills, Illinois (IL 60457) profile: population, map...
www.city-data.com/city/Hickory-Hills-Illinois.html
TCF National Bank: Hickory Hills Branch #2108 at 9357 South Roberts Road, branch ... Holding Company: Metropolitan Bank Group, Inc. JPMorgan **Chase Bank**, ...... Jean Zhang (9); George **Kasboske** (4); Bart Dziabala (3); John M. Aaron (3) ...

1. Patent US4738359 - Cigarette carton assembly - Google Patents
www.google.com.mx/patents/US4738359
   ◦
2. 

... George **Kasboske**, Packaging system for an object and method of packaging an ...Owner name: JPMORGAN **CHASE BANK**, N.A., AS COLLATERAL AGENT, NE ...Owner name: JP MORGAN **CHASE BANK** 270 PARK AVENUENEW YORK , ...

1. Patent US6601981 - Headlight assembly - Google Patents
www.google.com.mx/patents/US6601981
   ◦
2. 

US4586116 *, 21 Sep 1984, 29 Apr 1986, **Kasboske** George C, Vehicle .... Owner name: JPMORGAN **CHASE BANK**, N.A., AS ADMINISTRATIVE AGENT.

Sec.
18a. Premerger notification and waiting period.
19. Interlocking directorates and officers.
19a, 20. Repealed.
21. Enforcement provisions.
21a. Actions and proceedings pending prior to June 19, 1936; additional and continuing violations.
22. District in which to sue corporation.
23. Suits by United States; subpoenas for witnesses.
24. Liability of directors and agents of corporation.
25. Restraining violations; procedure.
26. Injunctive relief for private parties; exception; costs.
26a. Restrictions on the purchase of gasohol and synthetic motor fuel.
26b. Application of antitrust laws to professional major league baseball.
27. Effect of partial invalidity.
27a. Transferred.
28. Repealed.
29. Appeals.
30 to 33. Repealed.
34. Definitions applicable to sections 34 to 36.
35. Recovery of damages, etc., for antitrust violations from any local government, or official or employee thereof acting in an official capacity.
36. Recovery of damages, etc., for antitrust violations on claim against person based on official action directed by local government, or official or employee thereof acting in an official capacity.
37. Immunity from antitrust laws.
37a. Definitions.
37b. Confirmation of antitrust status of graduate medical resident matching programs.
38. Association of marine insurance companies; application of antitrust laws.

HISTORICAL NOTE

This chapter includes among other statutory provisions the Sherman Act, comprising sections 1 to 7 of this title, the Clayton Act, comprising sections 12, 13, 14 to 19, 20, 21, and 22 to 27 of this title and sections 52 and 53 of Title 29, Labor, the Wilson Tariff Act, comprising sections 8 and 9 of this title, the Robinson-Patman Price Discrimination Act, comprising sections 13, 13a, 13b, and 21a of this title, the "Expediting Act", sections 28 and 29 of this title, and the "Hart-Scott-Rodino Antitrust Improvements Act of 1976", comprising sections 15c to 15h, 18a, and 66 of this title. For complete classification of the Hart-Scott-Rodino Act, see Short Title note under section 1 of this title.

CONGRESSIONAL INVESTIGATION OF MONOPOLY

Joint Res. June 16, 1938, ch. 456, 52 Stat. 705, created a Temporary National Economic Committee which was authorized to make a full investigation on monopoly and the concentration of economic power in and financial control over production and distribution of goods and services. The time for submitting the final report under Joint Res. June 16, 1938, ch. 456, 52 Stat. 705, as amended Apr. 26, 1939, ch. 104, §§1, 2, 53 Stat. 624, was extended to Apr. 3, 1941, by Joint Res. Dec. 16, 1940, ch. 932, 54 Stat. 1225. The committee's report was presented to Congress on Mar. 31, 1941, and was published in Senate Document No. 35.

EXECUTIVE ORDER NO. 12022

Ex. Ord. No. 12022, Dec. 1, 1977, 42 F.R. 61441, as amended by Ex. Ord. No. 12052, Apr. 7, 1978, 43 F.R. 15133, which related to the National Commission for the Review of Antitrust Laws and Procedures, was revoked by Ex. Ord. No. 12258, Dec. 31, 1980, 46 F.R. 1251, set out as a note under section 14 of the Appendix to Title 5, Government Organization and Employees.

**§1. Trusts, etc., in restraint of trade illegal; penalty**

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

(July 2, 1890, ch. 647, §1, 26 Stat. 209; Aug. 17, 1937, ch. 690, title VIII, 50 Stat. 693; July 7, 1955, ch. 281, 69 Stat. 282; Pub. L. 93–528, §3, Dec. 21, 1974, 88 Stat. 1708; Pub. L. 94–145, §2, Dec. 12, 1975, 89 Stat. 801; Pub. L. 101–588, §4(a), Nov. 16, 1990, 104 Stat. 2880; Pub. L. 108–237, title II, §215(a), June 22, 2004, 118 Stat. 668.)

AMENDMENTS

2004—Pub. L. 108–237 substituted "$100,000,000" for "$10,000,000", "$1,000,000" for "$350,000", and "10" for "three".

1990—Pub. L. 101–588 substituted "$10,000,000" for "one million dollars" and "$350,000" for "one hundred thousand dollars".

1975—Pub. L. 94–145 struck out from first sentence two provisos granting anti-trust exemption to State fair trade laws.

1974—Pub. L. 93–528 substituted "a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years" for "a misdemeanor, and on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year".

1955—Act July 7, 1955, substituted "fifty thousand dollars" for "five thousand dollars".

1937—Act Aug. 17, 1937, inserted two provisos.

EFFECTIVE DATE OF 2001 AMENDMENT

Pub. L. 107–72, §4, Nov. 20, 2001, 115 Stat. 650, provided that: "This Act [enacting and amending provisions set out as notes under this section] and the amendments made by this Act shall take effect on September 30, 2001."

EFFECTIVE DATE OF 1975 AMENDMENT

Section 4 of Pub. L. 94–145 provided that: "The amendments made by sections 2 and 3 of this Act [amending this section and section 45 of this title] shall take effect upon the expiration of the ninety-day period which begins on the date of enactment of this Act [Dec. 12, 1975]."

SHORT TITLE OF 2009 AMENDMENT

Pub. L. 111–30, §1, June 19, 2009, 123 Stat. 1775, provided that: "This Act [enacting and amending provisions set out as notes under this section] may be cited as the 'Antitrust Criminal Penalty Enhancement and Reform Act of 2004 Extension Act'."

SHORT TITLE OF 2008 AMENDMENT

Pub. L. 110–327, §1, Sept. 30, 2008, 122 Stat. 3566, provided that: "This Act [amending provisions set out as a note under this section] may be cited as the 'Need-Based Educational Aid Act of 2008'."

SHORT TITLE OF 2007 AMENDMENT

Pub. L. 110–6, §1, Feb. 26, 2007, 121 Stat. 61, provided that: "This Act [amending provisions set out as a note

Minor changes in phraseology were made.

AMENDMENTS

1994—Pub. L. 103–322 substituted "fined under this title" for "fined not more than $1,000".

1970—Pub. L. 91–375 substituted "Postal Service" for "Post Office Department of the United States".

EFFECTIVE DATE OF 1970 AMENDMENT

Amendment by Pub. L. 91–375 effective within 1 year after Aug. 12, 1970, on date established therefor by Board of Governors of United States Postal Service and published by it in Federal Register, see section 15(a) of Pub. L. 91–375, set out as an Effective Date note preceding section 101 of Title 39, Postal Service.

### § 1343. Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

(Added July 16, 1952, ch. 879, §18(a), 66 Stat. 722; amended July 11, 1956, ch. 561, 70 Stat. 523; Pub. L. 101–73, title IX, §961(j), Aug. 9, 1989, 103 Stat. 500; Pub. L. 101–647, title XXV, §2504(i), Nov. 29, 1990, 104 Stat. 4861; Pub. L. 103–322, title XXXIII, §330016(1)(H), Sept. 13, 1994, 108 Stat. 2147; Pub. L. 107–204, title IX, §903(b), July 30, 2002, 116 Stat. 805; Pub. L. 110–179, §3, Jan. 7, 2008, 121 Stat. 2557.)

AMENDMENTS

2008—Pub. L. 110–179 inserted "occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or" after "If the violation".

2002—Pub. L. 107–204 substituted "20 years" for "five years".

1994—Pub. L. 103–322 substituted "fined under this title" for "fined not more than $1,000".

1990—Pub. L. 101–647 substituted "30" for "20" before "years".

1989—Pub. L. 101–73 inserted at end "If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 20 years, or both."

1956—Act July 11, 1956, substituted "transmitted by means of wire, radio, or television communication in interstate or foreign commerce" for "transmitted by means of interstate wire, radio, or television communication".

### § 1344. Bank fraud

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

(Added Pub. L. 98–473, title II, §1108(a), Oct. 12, 1984, 98 Stat. 2147; amended Pub. L. 101–73, title IX, §961(k), Aug. 9, 1989, 103 Stat. 500; Pub. L. 101–647, title XXV, §2504(j), Nov. 29, 1990, 104 Stat. 4861.)

AMENDMENTS

1990—Pub. L. 101–647 substituted "30" for "20" before "years".

1989—Pub. L. 101–73 amended section generally, restating former subsec. (a) and striking out former subsec. (b) which defined "federally chartered or insured financial institution". Prior to amendment, subsec. (a) read as follows: "Whoever knowingly executes, or attempts to execute, a scheme or artifice—

"(1) to defraud a federally chartered or insured financial institution; or

"(2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both."

### § 1345. Injunctions against fraud

(a)(1) If a person is—

(A) violating or about to violate this chapter or section 287, 371 (insofar as such violation involves a conspiracy to defraud the United States or any agency thereof), or 1001 of this title;

(B) committing or about to commit a banking law violation (as defined in section 3322(d) of this title); or

(C) committing or about to commit a Federal health care offense;

the Attorney General may commence a civil action in any Federal court to enjoin such violation.

(2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation (as defined in section 3322(d) of this title) or a Federal health care offense or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court—

(A) to enjoin such alienation or disposition of property; or

(B) for a restraining order to—

(i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and

(ii) appoint a temporary receiver to administer such restraining order.

(3) A permanent or temporary injunction or restraining order shall be granted without bond.

(b) The court shall proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or



**PIERCE AND ASSOCIATES**
ATTORNEYS AT LAW
1 North Dearborn, Suite 1300
Chicago, Illinois 60602-4321

U S POSTAGE PITNEY BOWES
ZIP 60602 $ 000.48⁵

RECEIVED 11-24-2015

George Kasbaske
9040 S 85th Avenue
Hickory Hills, IL 60457

60457$1323 C081



FedEx Office

DELIVERY RECEIPTS, SENT BOUND BOOKS TO PIERCE & ASSOCIATES SHOWING THEIR CRIMINAL ACTIONS

Address: 5727 S LAGRANGE RD
COUNTRYSIDE
IL 60525
Location: MDWK
Device ID: -BTC01
Transaction: 860120539287

FedEx Ground
781398527743 15.8 LB (S) 18.04
Direct signature required
Declared Value 500

FedEx Ground
781398540751 0.2 LB (S) 11.49
Direct signature required
Declared Value 100

Shipment subtotal: $29.53

**Total Due: $29.53**

(S) CreditCard: $29.53
************9069

M = Weight entered manually
S = Weight read from scale
T = Taxable item

Terms and Conditions apply. See fedex.com/us/service-guide for details.

Visit us at: fedex.com
Or call 1.800.GoFedEx
1.800.463.3339

September 25, 2015 12:10:53 PM

********** WE LISTEN **********
Tell us how we're doing
& receive a discount on your next order!
fedex.com/welisten or 800-398-0242
Redemption Code: ___________

*** Thank you ***

FedEx Office

Address: 5727 S LAGRANGE RD
COUNTRYSIDE
IL 60525
Location: MDWK
Device ID: -B[illegible]
Transaction: 860[illegible]288

FedEx Ground
781403369633 1.3 LB (S) 9.39
Declared Value 100

Shipment subtotal: $9.39

**Total Due: $9.39**

Cash: $20.00

Change Due: $10.61

M = Weight entered manually
S = Weight read from scale
T = Taxable item

Terms and Conditions apply. See fedex.com/us/service-guide for details.

Visit us at: fedex.com
Or call 1.800.GoFedEx
1.800.463.3339

September 26, 2015 12:23:48 PM

********** WE LISTEN **********
Tell us how we're doing
& receive a discount on your next order!
fedex.com/welisten or 800-398-0242
Redemption Code: ___________

*** Thank you ***



**SENT TO**
**PIERCE & ASSOCIATES**
**&**
**CHASE BANK**

| | |
|---|---|
| Address: | 5727 S LAGRANGE RD<br>COUNTRYSIDE<br>IL 60525 |
| Location: | MDWK |
| Device ID: | -BTC01 |
| Transaction: | 860124065271 |

---

**FedEx Standard Overnight**
781817295885 0.2 LB (S) 25.50
Direct signature required
Declared Value 0

**FedEx 2Day**
781817343012 0.2 LB (S) 21.75
Direct signature required
Declared Value 0

Shipment subtotal: $47.25

**Total Due: $47.25**

Cash: $100.00

Change Due: $52.75

M = Weight entered manually
S = Weight read from scale
T = Taxable item

Terms and Conditions apply. See fedex.com/us/service-guide for details.

Visit us at: fedex.com
Or call 1.800.GoFedEx
1.800.463.3339

November 30, 2015 3:22:35 PM

---

********** WE LISTEN **********
Tell us how we're doing
& receive a discount on your next order!
fedex.com/welisten or 800-398-0242
Redemption Code:

# Exhibit
# ( I )

Motion Slip (3/19/12) CCCH 0048 A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

## MOTION SLIP

CASE NO. 10 CH 43017

CALENDAR: ____________

ATTORNEY CODE: ARDC# 6299216

MOTION FOR: ◉ PLAINTIFF ◉ DEFENDANT

DATE REQUESTING: 11-09-2015

CALL TIME: 2:30 P.M. a.m./p.m.

◉ CONTESTED ◉ NOT CONTESTED

PLAINTIFF'S NAME: JP Morgan NA, Pierce & Associates, P.C. Benjamin N. Burstein

DEFENDANT'S NAME: Mr. & Mrs. George & Hannah Kasboske

ATTORNEY'S NAME: George Kaboske Pro Se Attorney Leonard Kral

FIRM NAME: N. A.

ATTY. TELEPHONE: (708) 430-5561

**PLEASE CHECK BOX ON THE REVERSE SIDE OF THIS FORM FOR THE TYPE OF MOTION.**

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

(3/19/12) CCCH 0048 B

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

**SPINDLED MOTION FORM**

- [x] 1501 ADD ADDTL PARTY
- [ ] 1502 ALTERNATIVE SERVICE
- [x] 1503 AMEND ORDER
- [ ] 1504 APPT. COMMISSIONER
- [ ] 1505 APPT. RECEIVER
- [ ] 1506 APPT. SELLING OFFICER
- [ ] 1507 APPROVE RECEIVER RPT.
- [ ] 1508 APPROVE SALE
- [ ] 1509 CERTIFY CLASS
- [ ] 1511 CHANGE OF VENUE
- [ ] 1512 CITATION – DISCOVER ASSETS
- [ ] 1513 COMPEL DISCOVERY
- [ ] 1514 CONSOLIDATE
- [ ] 1515 CONTINUE HEARING
- [ ] 1516 DEFAULT
- [ ] 1517 DEPOSIT FUNDS
- [ ] 1518 DISPERSE FUNDS
- [ ] 1519 DISCHARGE RECEIVER
- [ ] 1520 DISCOVERY SANCTIONS
- [x] 1521 DISMISS
- [x] 1522 DISMISS PARTY
- [ ] 1523 EXTEND DISCOVERY DATE
- [ ] 1524 EXTENDED POSSESSION
- [ ] 1525 EXTEND TIME FOR FILING
- [ ] 1526 FILE AMENDED PLEADINGS
- [ ] 1527 GOOD FAITH FINDING
- [ ] 1528 INTERLOCUTORY APPEAL
- [ ] 1529 INTERVENE
- [ ] 1530 ISSUE JUDICIAL DEED
- [ ] 1531 JUDGMENT OF FORECLOSURE AND SALE
- [ ] 1532 FILE APPEARANCE AND PLEADING
- [ ] 1533 LIFT STAY
- [ ] 1534 MISC. MOTION
- [ ] 1535 SUBST. OF JUSTICE
- [ ] 1536 PLACE MORT. IN POSSESSION
- [ ] 1537 PRELIMINARY INJUNCTION
- [ ] 1538 PROTECTIVE ORDER
- [ ] 1539 PROVE-UP
- [ ] 1540 QUASH
- [ ] 1541 RECONSIDER
- [ ] 1542 RELEASE SURPLUS
- [ ] 1543 RESET BRIEFING – SCHEDULE
- [ ] 1544 RULE TO SHOW CAUSE
- [ ] 1545 SANCTIONS
- [ ] 1546 SET APPEAL BOND
- [ ] 1547 SET BOND
- [ ] 1548 SET BRIEFING SCHEDULE
- [ ] 1549 SET CASE MANAGEMENT CONFERENCE
- [ ] 1550 PRETRIAL SETTLEMENT CONFERENCE
- [ ] 1551 SPECIAL PROCESS SERVER
- [ ] 1552 STAY ADMINISTRATIVE ORDER
- [ ] 1553 STAY DISCOVERY
- [ ] 1554 STAY SALE
- [ ] 1555 STRIKE PLEADING
- [ ] 1556 SUBSTITUTE ATTORNEY
- [ ] 1557 SUMMARY JUDGMENT
- [ ] 1558 SUPPLEMENTAL DISCOVERY
- [ ] 1559 TEMPORARY RESTRAINING ORDER
- [ ] 1560 TRANSFER
- [ ] 1561 VACATE DWP
- [ ] 1562 VACATE ORDER
- [ ] 1564 WITHDRAW

BOX 1501

ADDITIONAL PARTY:

Leonard Kral, President of the ( I G O I ) Independent Garage Owners Of Illinois.


BOX 1503

Amended Order:

George and Hannah Kasboske (Pro Se Defendants) wish to amend the Last Court

Order, dated February 20, 2014, where the Court never allowed the Pro Se Defendants

to enter any evidence in their defense from the Summary Summons. Federal Consent

Decree #Civil No. 3106 Filed: October 23rd 1963, was not entered into the Chancery

Court record. Consent decree # Civil No. 3106 Filed: October 23rd 1963, became

relevant when the Court sustained the Illegal actions of Pierce & Associates when they

claimed Federally Controlled Intellectual Patents for their client JPMorgan Bank

National Association. And, then Pierce and Associates, acting as representatives of J.

P. Morgan Chase Bank, NA, also DBA, J. P. Morgan Home Finance L. L. C. et. al.

(hereinafter Chase Bank), placed U.S. Patents, that were owned by two separate

corporations, which employed George Kasboske, on the World Wide Web, without any

legal due process. As a result of this illegal action by Pierce and Chase, et. al., George

Kasboske was unable to license, lease or sell any of the corporate technology, which

was the only way that Mr. Kasboske had to repay any of the loans. Please see attached

Chase Patent Fraud document patent, which proves that Chase Bank illegally tried to

claim patents without due process. After Mr. Kasboske had objected to this in court, it

was scrubbed shortly thereafter from the website, which was after the damage had been done. But the court refused to act on it.

BOX 1521

Dismiss:

Since the Government's agencies, including the federal, state and municipal governments, including all government officials, are members of ( A A M V A, American Association of Motor Vehicle Administrators and I I C M V A, Insurance Industry Committee On Motor Vehicle Administration ) or are in concert and participation with A A M V A and I I C M V A) never allowed the Kasboske's the opportunity to enter any defensive evidence, the Chancery Court had no realization that they were in direct violation of Consent Decree # Civil No. 63 Civ. 3106 Filed: October 23rd 1963. Government officials already have an injunction against them under the aforementioned judgment preventing them from exercising any control over the activities of Mr. Kasboske.

Civil No. 63 Civ. 3106 Filed: October 23rd 1963, Page 2 of the Final Judgement, Paragraph 4, (A) (3)

# 3 Exercising any control over the activities of any appraisor of damage to automotive vehicles. Mr. Kasboske is exempt from paying insurance and taxation, since George Kasboske is an appraisor of the IGOI (Independent Garage Owners of Illinois, which

was the aggrieved party of the '63 Consent Decree.

Chase Bank, a member of A A M V A, is illegally petitioning the judge, a member of A A M V A and for the court to transfer ownership of the aforementioned property, which violates the injunction of the Final Judgement—63 Civ. 3106 Filed: October 23rd 1963

Most of his adult life, George was a owner and appraiser of vehicles and then became an inventor of automotive products, but not limited to, and then was able to purchase his two homes.

Chase and the courts are actively acting in concert and participation to rob and siezed Mr. Kasboske's properties. J P Morgan Chase, et al. and the court system are in contempt of the 63 Civ. 3106 Filed: October 23rd 1963

J. P. Morgan Chase Bank, NA, also DBA, J. P. Morgan Home Finance L. L. C. et. al., is a member of A A M V A and I I M C V A, prevents the seizing of the Kasboske's properties under the Federal Consent Decree.

BOX 1521

Dismiss Party:

The Kasboske's motion to dismiss all charges past and present based on the enclosed evidence.

Case Lookup
Choose Party(s)
Upload Documents
Filing Summary
Filing Fees
Payment
Scheduling Motion

**File Motion**

**Step 2: Choose party(s) to file for**

Case Number: **2010-CH-43017**
Division: **CH**
Case Type: **OWNER OCCUPIED SINGLE FAMILY HOME OR CONDOMINIUM**
District: **1**

* Choose Party or Parties

| Choose | Name | Party Number |
|---|---|---|
| ☐ | CHASE HOME FINANCE | P1 |
| ☑ | KASBOSKE GEORGE | D1 |
| ☐ | KASBOSKE HANNAH | D2 |
| ☐ | JPMORGAN CHASE BANK | D3 |
| ☐ | UNKNOWN OWNERS | D4 |
| ☐ | NONRECORD CLAIMANTS | D5 |

**Choose Motion Type(s):**

| Choose | Description | ActivityCode |
|---|---|---|
| ☑ | ADD ADDITIONAL PARTY(SET FOR MOTION HEARING) | 1501 |
| ☐ | ALTERNATIVE SERVICE(SET FOR MOTION HEARING) | 1502 |
| ☑ | AMEND ORDER(SET FOR MOTION HEARING) | 1503 |
| ☐ | APPOINT RECEIVER(SET FOR MOTION HEARING) | 1505 |
| ☐ | APPROVE RECEIVER'S RPT.(SET FOR MOTION HEARING) | 1507 |
| ☐ | APPROVE SALE(SET FOR MOTION HEARING) | 1508 |
| ☐ | APPT. SELLING OFFICER(SET FOR MOTION HEARING) | 1506 |
| ☐ | APPT.COMMISSIONER(SET FOR MOTION HEARING) | 1504 |
| ☐ | CERTIFY CLASS(SET FOR MOTION HEARING) | 1509 |
| ☐ | CHANGE OF VENUE(SET FOR MOTION HEARING) | 1511 |
| ☐ | CITATION DISCOVER ASSETS(SET FOR MOTION HEARING) | 1512 |
| ☐ | COMPEL DISCOVERY(SET FOR MOTION HEARING) | 1513 |
| ☐ | CONSOLIDATE(SET FOR MOTION HEARING) | 1514 |
| ☐ | CONTINUE HEARING(SET FOR MOTION HEARING) | 1515 |
| ☐ | DEFAULT(SET FOR MOTION HEARING) | 1516 |
| ☐ | DEPOSIT FUNDS(SET FOR MOTION HEARING) | 1517 |
| ☐ | DISBURSE FUNDS(SET FOR MOTION HEARING) | 1518 |
| ☐ | DISCHARGE RECEIVER(SET FOR MOTION HEARING) | 1519 |
| ☐ | DISCOVERY SANCTIONS(SET FOR MOTION HEARING) | 1520 |
| ☑ | DISMISS PARTY(SET FOR MOTION HEARING) | 1522 |
| ☑ | DISMISS(SET FOR MOTION HEARING) | 1521 |
| ☐ | EXTEND DISCOVERY CUT-OFF(SET FOR MOTION HEARING) | 1523 |
| ☐ | EXTEND POSSESSION(SET FOR MOTION HEARING) | 1524 |

Previous Next



State of Illinois – First Judicial District
Clerk of the Circuit Court
of Cook County

Dorothy Brown
CLERK OF THE CIRCUIT COURT

Logout | Forms | User Instructions | End User Guide | FAQ

eFile
brought to you by USCourts.com

Electronic Filing System
File your court case online

Home Complaint ▸ Appeal Appearance Notice Motion ▸ Pleading ▸ New eFile Features Fee Schedule ▸ Email My Account ▸

## E-File Receipt File Motion

Print and Save

**Trace #: 1533VK01**

**Filing For:**

| Name |
|---|
| KASBOSKE GEORGE |

**Case Name:** CHASE HOME FINANCE vs. KASBOSKE GEORGE
**Filing Type:**
**Case Number:** 2010-CH-43017
**Division:** CH
**Case Type:** OWNER OCCUPIED SINGLE FAMILY HOME OR CONDOMINIUM
**District:** 1
**Motion Scheduled:** YES, Date:11/23/2015 Time:2:30 P.M. Call#:007 Calendar:60

**Notices will be electronically served to the following parties:**

| Party Name | Attorney | Email |
|---|---|---|
| CHASE HOME FINANCE | HEILIZER LAW OFFICES | glenn@heilizer.com |

**The following parties will need to be served by mail:**

| Party Name | Attorney | Address | City | State | Zip |
|---|---|---|---|---|---|
| CHASE | PIERCE & ASSOCIATES | 1 N DEARBORN #1300 | CHICAGO, | IL | 60602 |
| CHASE HOME | PIERCE & ASSOCIATES | 1 N DEARBORN #1300 | CHICAGO, | IL | 60602 |
| CHASE HOME FINANCE | PIERCE & ASSOCIATES | 1 N DEARBORN #1300 | CHICAGO, | IL | 60602 |
| JPMORGAN CHASE BANK | PRO SE | | | | |
| KASBOSKE GEORGE | PRO SE | | | | |
| KASBOSKE HANNAH | PRO SE | | | | |
| NONRECORD CLAIMANTS | PRO SE | | | | |

**Documents Uploaded**

| Title | Description | MB |
|---|---|---|
| ADD ADDITIONAL PARTY(SET FOR MOTION HEARING) | | 2.971 |
| NOTICE OF MOTION | | |
| SCHEDULED MOTION FORM | | |

| Description | ActivityCode |
|---|---|
| ADD ADDITIONAL PARTY(SET FOR MOTION HEARING) | 1501 |
| AMEND ORDER(SET FOR MOTION HEARING) | 1503 |
| DISMISS(SET FOR MOTION HEARING) | 1521 |

**Filing Fees**

| Description | Amount |
|---|---|
| Total Fees | $0.00 |
| Convenience Fee | $2.95 |
| E-Payment Fee | $1.00 |
| Grand Total | $3.95 |

Print View Continue

**ALERT!! INFORMATION LOST IF IDLE TOO LONG! Please be aware that you will be logged-off the Electronic Filing System if the program remains in idle status for one hour or more. Any information not submitted at the time will be lost.**

# Exhibit
# ( J )

( J )

WWW.CYBERDRIVEILLINOIS.COM

JESSE WHITE
SECRETARY OF STATE

# CORPORATION FILE DETAIL REPORT

| Entity Name | INDEPENDENT GARAGE OWNERS OF ILLINOIS | File Number | 38793292 |
|---|---|---|---|
| Status | ACTIVE | | |
| Entity Type | CORPORATION | Type of Corp | NOT-FOR-PROFIT |
| Incorporation Date (Domestic) | 05/12/1959 | State | ILLINOIS |
| Agent Name | VICTOR THOMAS KRAL | Agent Change Date | 11/09/2011 |
| Agent Street Address | 9307 S 86TH COURT | President Name & Address | |
| Agent City | HICKORY HILLS | Secretary Name & Address | |
| Agent Zip | 60457 | Duration Date | PERPETUAL |
| Annual Report Filing Date | 04/15/2015 | For Year | 2015 |

Return to the Search Screen

Purchase Certificate of Good Standing

**(One Certificate per Transaction)**

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

# Exhibit
# ( K )

( K )



**Identification Card**
**No. 1618110658**
ISSUED BY

**INDEPENDENT GARAGE OWNERS OF ILLINOIS**

**Operating Under Consent Decree 63. Civ. 3106**

Mr. George Kasboske

Mr. George Kasboske
Director I.G.O.I.

The Independent Garage Owners of Illinois (I.G.O.I.) certifies that the Identification information on the reverse side of this identification card is accurate and that the person identified is in good standing with the (I.G.O.I). Further the (I.G.O.I.) extends all rights and privileges granted to them under the 1963. Civ. 3106 perpetual Consent Decree signed by the Attorney General of the United States at the time, Robert F. Kennedy.

1. This complaint is filed and these proceedings are instituted under Section 4 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209 (15 U.S.C. 4), as amended, entitled "An Act to protect trade and commerce against unlawful restraints and Monopolies," commonly known as the Sherman Act, in order to prevent and restrain continuing violations by the defendants, as hereinafter alleged, of Sections 1 and 3 of the Sherman Act. 2. The defendant's Association of Casualty and Surety Companies; American Mutual Insurance Alliance; & National Association Of Mutual Casualty Companies. Corporation File No. 3879-329-2

PRESIDENT OF THE (I G O I) SIGNATURE

Mr. George Kasboske

REGISTERED DIRECTOR (I G O I) SIGNATURE

I Mr. Leonard Kral, President of the ( I G O I ) hereby certify that the attached signature that appears on this identification card copy is mine,, and the signature below mine is that of director Mr. George Kasboske of the ( I G O I ) and has been since 1984.

Mr. Leonard Kral 12-6-2015

# Exhibit
# ( L )

( L )

# Special Bulletin

INDEPENDENT GARAGE OWNERS of AMERICA, Inc.
36½ North Lewis Avenue • Tulsa 10, Oklahoma

November 5, 1963
NB-49

TO: All Body Shop Committee Members

Gentlemen:

As National Bulletin-47, November 1, 1963 stated, the 265 insurance companies are now prohibited from demanding discounts on parts, special hourly rates, or other special considerations such as free towing service, free storage. Furthermore the insurance companies cannot boycott you if you do not accept their appraisal or estimate, nor can the insurance companies recommend, advise, or suggest to the vehicle owner, the damaged vehicle be repaired by such and such firm.

In other words, practices of the insurance companies the body shops have been complaining about for years is now eliminated through the Consent Decree entered into with the Department of Justice by three national trade associations.

The elimination of this problem is the greatest event ever to occur in the automotive industry. In dollars and cents it is worth over 50 million dollars a year to the automotive repair industry. And it was all made possible through the efforts of IGO members.

What is your reaction to this? We would like to know, because the results can be used to the advantage of IGO-A in securing new members, solidifying our present membership and improving relations with other segments of the industry.

May we hear from you by return mail?

Sincerely yours,

James A. Hueser, Manager

JAH/eb

Be among the 500 at the 500 * IGOA National Convention * Indianapolis * May 31, June 1-3, 1964

# Special Bulletin

Reducing this to its bare essentials, the U.S. District Court has forced the Ass'n of Casualty and Surety Companies, the Mutual Alliance and the National Ass'n of Mutual Casualty Companies to cancel and abandon their independent appraisal plan, sometimes known as Automotive Damage Appraisal Plan, with the results that more than 265 insurance companies belonging to those associations must:

(a) Immediately stop recommending any appraiser of vehicles;

(b) immediately stop directing repair work to any particular appraiser or any repair shops;

(c) immediately stop fixing or otherwise controlling charges to be made by repair shops;

(d) immediately stop fixing or otherwise controlling the price paid for replacement parts or labor in connection with the repair of vehicles either by way or coercion, boycott or the use of flate rate manuals or parts manuals.

The Dept. of Justice has been given the right at any time to investigate the books and records of the association's and insurance companies' involved to make sure that they are abiding by the said judgement. This final judgement represents the culmination to date of many years of dogged and determined work by IGOA and affiliates.

Whenever you feel that the letter or spirit of the judgement is being violated, CALL THIS OFFICE IMMEDIATELY; we will follow through.

Let's hope that this judgement marks the beginning of the end of the "pushing around" we have taken these many ages.

Frank Stepanek, Chairman

December, 1963

( M )

# Exhibit
# ( M )

# STATE OF ILLINOIS

## *OFFICE OF*
## *THE SECRETARY OF STATE*

*To all to whom these Presents Shall Come, Greeting:*

**I, JESSE WHITE, Secretary of State of the State of Illinois, do hereby certify that the following and hereto attached is a true copy of Enrolled Law # 35402,** *"An Act to prohibit certain contracts, combinations, monopolies and conspiracies in restraint of trade or commerce; to exempt certain activities from provisions of the Act; to provide criminal penalties and civil remedies for violations of the Act; and to repeal certain Acts therein named"*, **approved July, 1965, originating from Record Series 103.030; Enrolled Acts of the General Assembly, from the records of the Illinois State Archives.**

*In Testimony Whereof I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois, Done at the City of Springfield this 21st day of February A.D. 2012*

Jesse White

SECRETARY OF STATE

SB 116 Mo.

An Act to prohibit certain contracts, combinations, monopolies and conspiracies in restraint of trade or commerce; to exempt certain activities from the provisions of the Act; to provide criminal penalties and civil remedies for violations of the Act; and to repeal certain Acts therein named.

Be it enacted by the People of the State of Illinois, represented in the General Assembly:

Section 1. This Act shall be known and may be cited as the Illinois Antitrust Act.

Section 2. The purpose of this Act is to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade, whether in manufacturing, distribution, financing, and service industries or in related for-profit pursuits.

Section 3. Every person shall be deemed to have committed a violation of this Act who shall:

(1) Make any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person:

a. for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any commodity sold or bought by the parties

Originated in the Senate Edward E. Fernandes

Secretary of the Senate

thereto, or the fee charged or paid for any service performed or received by the parties thereto;

b. fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect stated in paragraph a. of subsection (1);

c. allocating or dividing customers, territories, supplies, sales, or markets, functional or geographical, for any commodity or service; or

(2) By contract, combination, or conspiracy with one or more other persons unreasonably restrain trade or commerce; or

(3) Establish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce.

Section 4. As used in this Act, unless the context otherwise requires:

"Trade or commerce" includes all economic activity involving or relating to any commodity or service.

"Commodity" shall mean any kind of real or personal property.

"Service" shall mean any activity, not covered by the definition of "commodity," which is performed in whole or in part for the purpose of financial gain.

"Service" shall not be deemed to include labor which is performed by natural persons as employees of others.

###

"Person" shall mean any natural person, or any corporation, partnership, or association of persons.

Section 5. No provisions of this Act shall be construed to make illegal:

(1) the activities of any labor organization or of individual members thereof which are directed solely to labor objectives which are legitimate under the laws of either the State of Illinois or the United States;

(2) the activities of any agricultural or horticultural cooperative organization, whether incorporated or unincorporated, or of individual members thereof, which are directed solely to objectives of such cooperative organizations which are legitimate under the laws of either the State of Illinois or the United States;

(3) the activities of any public utility as defined in Section 10.3 of the Public Utilities Act to the extent that such activities are subject to the jurisdiction of the Illinois Commerce Commission, or to the activities of telephone mutual concerns referred to in Section 10.3 of the Public Utilities Act to the extent such activities relate to the providing and maintenance of telephone service to owners and customers.

(4) the activities (including, but not limited to, the making of or participating in joint underwriting or joint reinsurance arrangement) of any insurer, insurance agent, insurance broker, independent insurance adjuster or rating organization to the extent that such activities are subject to regulation by the Director of Insurance of this State under, or are permitted or are authorized by, the Insurance Code or any other law of this State;

(5) the religious and charitable activities of any not-for-profit corporation, trust or organization established

exclusively for religious or charitable purposes, or for both purposes;

(6) the activities of any not-for-profit corporation organized to provide telephone service on a mutual or co-operative basis or electrification on a co-operative basis, to the extent such activities relate to the marketing and distribution of telephone or electrical service to owners and customers;

(7) the activities engaged in by securities dealers who are (i) licensed by the State of Illinois or (ii) members of the National Association of Securities Dealers or (iii) members of any National Securities Exchange registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, in the course of their business of offering, selling, buying and selling, or otherwise trading in or underwriting securities, as agent, broker, or principal, and activities of any National Securities Exchange so registered, including the establishment of commission rates and schedules of charges;

(8) the activities of any board of trade designated as a "contract market" by the Secretary of Agriculture of the United States pursuant to Section 5 of the Commodity Exchange Act, as amended;

(9) the activities of any motor carrier of property as defined in "The Illinois Motor Carrier of Property Act", as heretofore or hereafter amended, to the extent that such activities are permitted or authorized by the Act or are subject to regulation by the Illinois Commerce Commission;

(10) the activities of any state or national bank to the extent that such activities are regulated or supervised by officers of the state or federal government under the banking laws of this State or the United States;

SB116 h

(11) the activities of any state or federal savings and loan association to the extent that such activities are regulated or supervised by officers of the state or federal government under the savings and loan laws of this State or the United States; or

(12) the activities of any bona fide not-for-profit association, society or board, of attorneys, practitioners of medicine, architects, engineers, land surveyors or real estate brokers licensed and regulated by an agency of the State of Illinois, in recommending schedules of suggested fees, rates or commissions for use solely as guidelines in determining charges for professional and technical services.

Section 6. Every person who shall wilfully do any of the acts prohibited by subsection (1) of Section 3 of this Act shall be guilty of a misdemeanor and shall be punished by a fine of up to $50,000, or by imprisonment not to exceed six months, or both.

(1) The Attorney General, with such assistance as he may from time to time require of the State's Attorneys in the several counties shall investigate suspected criminal violations of this Act and shall commence and try all prosecutions under this Act. Prosecutions under this Act may be commenced by complaint, information, or indictment. With respect to the commencement and trial of such prosecutions, the Attorney General shall have all of the powers and duties vested by law in State's Attorneys with respect to criminal prosecutions generally.

(2) A prosecution for any offense in violation of Section 6 of this Act must be commenced within four years after the commission thereof.

(3) The Attorney General shall not commence prosecutions under this Act against any defendant who, at the time,

is a defendant with regard to any current pending complaint, information or indictment filed by the United States for violation, or alleged violation, of the Federal Anti-Trust Statutes (including, but not being limited, Act of July 2, 1890, Ch. 647, 26 U.S. Stat. 209, 15 U.S.C.A., Secs. 1-7; Act of Oct. 15, 1914, Ch. 323, 38 U.S. Stat. 730, 15 U.S.C.A Secs. 12-27, 44; Act of August 17, 1937, Ch. 690 Title VIII 50 U.S. Stat. 693, 15 U.S.C.A. Sec. 1; Act of July 7, 1955, Ch. 281, 69 U.S. Stat. 282, 15 U.S.C.A. Secs. 1-3; Act of May 26, 1938, Ch. 283, 52 U.S. Stat. 446, 15 U.S.C.A. Sec. 13-C; and any similar Acts passed in the future) involving substantially the same subject matter.

Section 7. The following civil actions and remedies are authorized under this Act:

(1) The Attorney General, with such assistance as he may from time to time require of the State's Attorneys in the several counties, shall institute proceedings in equity in the Circuit Court to prevent and restrain violations of Section 3 of this Act. In such a proceeding, the court shall determine whether a violation has been committed, and shall enter such judgment or decree as it considers necessary to remove the effects of any violation which it finds, and to prevent such violation from continuing or from being renewed in the future. The court, in its discretion, may exercise all equitable powers necessary for this purpose, including, but not limited to, injunction, divestiture of property, divorcement of business units, dissolution of domestic corporations or associations, and suspension or termination of the right of foreign corporations or associations to do business in the State of Illinois.

(2) Any person who has been injured in his business

JNS
RPT

or property, or is threatened with such injury, by a violation of Section 3 of this Act may maintain an action in the Circuit Court for damages, or for an injunction, or both, against any person who has committed such violation. If, in an action for an injunction, the court issues an injunction, the complainant shall be awarded costs and reasonable attorney's fees. In an action for damages, if injury is found to be due to a violation of subsection (1) of Section 3 of this Act, the person injured shall be awarded three times the amount of actual damages resulting from that violation, together with costs and reasonable attorney's fees. If injury is found to be due to a violation of subsections (2) or (3) of Section 3 of this Act, the person injured shall recover the actual damages caused by the violation, together with costs and reasonable attorney's fees, and if it is shown that such violation was willful, the court may, in its discretion, increase the amount to be recovered as damages up to a total of three times the amount of actual damages. This State, any public organization organized under the authority of this State, and the United States, shall be considered a person having standing to bring an action under this subsection. Any action for damages under this subsection shall be forever barred unless commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this Act shall be revived by this Act.

JHJ
PPF

SB. 116 hh

Section 8. A final judgment or decree rendered in any civil or criminal proceeding brought by the Attorney General under this Act to the effect that a defendant has violated this Act shall be prima facie evidence against such defendant in any action for damages brought by any other party against such defendant under subsection (2) of Section 7 of this Act, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: Provided, that this Section shall not apply to civil consent judgments or decrees entered before any testimony has been taken.

Section 9. No contract, combination, conspiracy, or other act which violates this Act shall constitute or be deemed a conspiracy at common law.

Section 10. Nothing in this Act shall be deemed to amend, modify, or repeal in whole or in part the provisions of "An Act to protect trademark owners, distributors, and the public against injurious and uneconomic practices in the distribution of articles of standard quality under a trademark, brand or name", approved July 8, 1935, as amended.

Section 11. When the language of this Act is the same or similar to the language of a Federal Anti-trust Law, the courts of this state in construing this Act shall follow the construction given to the Federal Law by the Federal Courts.

Section 12. The following Acts are repealed:

"An Act to provide for the punishment of persons (copartnerships or corporations forming pools, trusts and

JWS
BFT

combines, and mode of procedure, and rules of evidence in such cases", approved June 11, 1891, as amended.

"An Act to define trusts and conspiracies against trade, declaring contracts in violation of the provisions of this act void, and making certain acts in violation thereof misdemeanors, and prescribing the punishment therefor and matters connected therewith", approved June 20, 1893, as amended.

Section 13. The following named sums, or so much thereof as may be necessary, respectively, for the objects and purposes hereinafter named, are appropriated to the Attorney General to carry out the purposes of this Act as follows:

| | |
|---|---|
| For Personal Services | $150,000 |
| For contractual Services | 25,000 |
| Total | $175,000 |

Approved July 21st 1965
[signature]
Governor

[signature]
President of the Senate

[signature]
Speaker, House of Representatives

357

**S. B. No.** 116

**An Act** *to prohibit certain contracts, combinations, monopolies and conspiracies in restraint of trade or commerce; to exempt certain activities from the provisions of the Act; to provide criminal penalties and civil remedies for violations of the Act; and to repeal certain Acts therein named.*

FILED
11:30 A.M. ........ P.M.
JUL 22 1965
Paul Powell
Secretary of State.

Enrolled ... July 9, ... 19 65

No. 691

Mayme Laurence
Enrolling, Transcribing and Typing Clerk.

74th General Assembly
State of Illinois

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

16CV2927
JUDGE BLAKEY
MAG. JUDGE GILBERT

**Plaintiff(s)**

**Case No.** 10 CH 43017

**V.**

GEORGE KASBOSKE; HANNAH KASBOSKE; JPMORGAN

CHASE BANK, NA

**Defendant(s)**

**EMERGENCY MOTION TO ENFORCE 63 CIV. 3106 AND TERMINATE POSSESSION**

NOW, COME THE DEFENDANTS, GEORGE and HANNAH KASBOSKE, by and through George Kasboske, Pro Se Attorney, who Motion this court to enforce 63 Civ. 3106 and to terminate possession, per Judge Michael T. Mullin's Order on 12-2-15. The Kasboske's were ordered to vacate their premises 30 days from 12-2-15.

1. On 11-9-15, Defendant responded to ANSWER IN CIVIL ASSET FORFEITURE

PROCEEDING, that his property at 9040 S. 85th Avenue, Hickory Hills, IL 60457

was not subject to forfeiture for the following reasons: "SEE ATTACHED. Anti-Trust, 63

CIV. 3106 (Exhibit A), George and Hannah Kasboske are protected by attached Judgment from

Chase Bank and Courts as IICMVA (Insurance Industry Committee On Motor Vehicle

Administration) / AAMVA (American Association Of Motor Vehicle Administrators)."

2. In spite of the aforementioned Federal Judgement, which was ignored, a ruling was rendered

by Judge Michael T. Mullen, Chancery Court, Cook County on 12-2-15, titled, "ORDER

APPROVING FORECLOSURE REPORT OF SALE AND DISTRIBUTION AND ORDER

FOR POSSESSION AND DEED" (Exhibit B), which denied the Kasboske's of their property.

3. With this action, Judge Mullin completely disregarded Defendants' ANSWER IN CIVIL

ASSET FORFEITURE PROCEEDING on 11-9-15 (Exhibit C) and didn't even address the 63

Civ. 3106 matter in his 12-2-15 written ruling, thereby violating George and Hannah Kasboske's

rights under the Judgment.

4. Furthermore, Chase Bank NA and Law Enforcement (Ex. Judges) are members of AAMVA (See AAMVA Quick Facts, and JPMorgan Chase Bank NA as AAMVA Associate Member; Exhibit D). And AAMVA is an associate member of IICMVA (See About the IICMVA, and IICMVA Antitrust Declaration; Exhibit E), both of which are descendants (defendants) of the 63 Civ. 3106 decree. See Background and Lineage of Defendants - 1963 Consent Decree—(Exhibit F),—- Flow Chart and Defendants, Successors and Beneficiaries, and Kasboske History—(Exhibit G), which shows a flow chart and explains the lineage of the trade associations, their participation in the Final Judgment, and how Chase Bank NA is exercising control over the activities of an appraiser of damage to motor vehicles – with monopolistic and oligarchic practices— which are enjoined by the Judgment. None of the Consent Decree defendants or their descendants have any authority to control, regulate or tax the Defendants, as Chase Bank NA through AAMVA promised not to do, because George Kasboske is exempt from the collective bargaining laws.

5. Chase Bank NA consented to the Final Judgment through its predecessors and assigns, and

acted in "concert and participation" with the Court, which they agreed they would not do.

Chase Bank and Law Enforcement have a conflict of interest in this matter because under their

membership in AAMVA, they are supposed to be protecting the Kasboske's by the Final

Judgment from monopolistic and oligarchic practices, per this case.

6. In addition, in his ruling, Judge Mullin also disregarded DEFENDANTS' ANSWER TO

PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR ORDER APPROVING REPORT

OF SALE AND DISTRIBUTION AND POSSESSION (Exhibit H), which Defendant filed on

11-30-15, as well as previous filings.

For example, on 11-9-15, the Defendant entered the attached Motion Slips (Exhibit I), which

he filed online with Dorothy Brown, Clerk of Circuit Court (receipt attached), and sought to

add additional party (Example- Leonard Kral, President IGOI) , amend the order, to dismiss

and to dismiss party, but Judge Mullin never addressed Defendant's filing.

Within the 11-30-15 filing (Exhibit H), Defendant showed that Chase Bank NA attempted to control and regulate Mr. Kasboske and the patents that were registered in his name and his companies' names, by illegally claiming that U.S. Patents issued in Mr. Kasboske's name as Chase Bank NA's property, without authorization or due process, which violates his activities and rights, and his companies' activities and rights, and restrained trade under 63 Civ. 3106, the Sherman Act and the Illinois Antitrust Act 1965 SB 116.

7. Judge Mullin was also prejudicial in his 12-2-15 ruling, ORDER APPROVING FORECLOSURE REPORT FOR SALE AND POSSESSION AND DEED (Exhibit B), which was presented in a typed format to the Kasboske's at the beginning of the hearing, but without any written ruling of the Motion that the Kasboske's presented on 11-30-15. In other words, the Judge had his order typed out before the case was closed. In fact, George Kasboske asked the Judge what motion he was ruling on, at which point, the Judge said, "Just stand there and listen." Then, the Judge presented to Mr. Kasboske his final ruling.

8. The IGOI (Independent Garage Owners of Illinois) has been in existence since 1959, per Secretary of State Records IGOI Corporate File (Exhibit J), for which George Kasboske has been a member and director. See IGOI Identification Card (Exhibit K).

9. The IGOA, IGOI and its members and successors are beneficiaries of the 63 Civ. 3106 perpetual decree, and are exempt from insurance and taxation, and which prevents Defendants (Chase Bank and Law Enforcement) from "exercising any control over the activities of any appraiser of damage to automotive vehicles (My emphasis)." Excerpted from Final Judgment, Page 2, Paragraph IV, (A) (3) (part of Exhibit A).

IGOA Correspondence from 1963 (Exhibit L) discusses original defendants (the three original trade organizations) and the culmination of the Consent Decree.

10. George Kasboske, an appraiser of the material damage repair, claims, and appraisal business, is also an inventor of patented inventions for the automotive, construction, food, and other industries.

11. Perhaps as importantly, Judge Mullin and Chase Bank NA not only violated the

Kasboske's rights under the Consent Decree, but also under the Illinois Antitrust Act 1965 SB

116 (Exhibit M), which was based upon the Injunction.

In Section 2., it states:

The purpose of this Act is to promote the unhampered growth of commerce and industry
throughout the State by prohibiting restraints of trade which are secured through monopolistic
practices and which act or tend to act to decrease competition between and among persons
engaged in commerce and trade, whether in manufacturing, distribution, financing, and service
industries or in related for-profit pursuits.

In Section 3. it states:

Every person shall be deemed to have committed a violation of this Act who shall: (1) Make any
contract with or engage in any combination or conspiracy with, any other person who is, or but
for a prior agreement would be, a competitor of such person: (b) fixing, controlling, maintaining,
limiting, or discontinuing the production, manufacture, mining, sale, or supply of any
commodity, or the sale or supply of any service, for the purpose or with the effect stated in
paragraph a. of this subsection (1);

It further defines that " 'Commodity' shall mean any kind of real or personal property."

(Example - patents in Kasboske's name and his residence.). It says " 'Person' shall mean any

natural person, or any corporation, partnership, or association of persons (My emphasis)."

Since the Illinois Antitrust Act was born from 63 Civ. 3106, Mr. and Mrs. Kasboske's rights were violated as "natural person(s)" under the previous definition, as well as under Mr. Kasboske's position as Director and member of the IGOI association.

In effect, Chase Bank NA "limited" the ability of George Kasboske to sell his companies' patents by illegally claiming his patents as being bank property, which they were not, and which the bank violated Section 3. (b) of the Act, thereby controlling his personal property. George Kasboske submitted proof of Chase Bank NA's illicit claims in his 11-30-15 filing with the Chancery Court. The bank thereby libeled Mr. Kasboske in its claims of ownership, which it ultimately scrubbed from the website. But, the damage was already done. In this manner, Chase Bank NA limited Mr. Kasboske from marketing or selling the patents, from which he would pay them back.

In addition, Chase Bank NA also illegally controlled "real property" (the Kasboske's property)

by presenting false information to the Court, which the Chancery Court ignored and rejected in prior filings with the Court, upon which the Judge relied and ultimately ruled. But, Judge Mullin never addressed the Kasboske's motions in his rulings, as he was acting in "concert and participation", either knowingly or unknowingly, with Chase Bank NA, as members of IICMVA / AAMVA.

Wherefore, due to the above reasons, Defendant respectfully requests that the Court implement a an Emergency Motion to enforce the Injunction against Chase Bank NA, to reverse the sale, vacate the eviction, remove and reverse the IN PERSONAM deficiency judgement entered in the sum of ($164, 837.56) and interest, refund property taxes paid, fully reinstate the Kasboske's previous good credit to the rating that existed prior to the Chase Bank loans and accord whatever other relief that the Court deems necessary.

Respectively submitted,

GEORGE KASBOSKE; HANNAH KASBOSKE

By:______________________________

George Kasboske, Pro Se Attorney

George Kasboske
Hannah Kasboske
9040 S. 85th Avenue
Hickory Hills, IL 60457
708-430-5563 Home
708-600-3726 Cell
773-277-5602 Fax
georgekasboske4710@comcast.net
Circuit Court Case No. 10- CH 43017